Timothy J. SHANAHAN, Jr., Appellant,

v.

ATLANTIC REFINING COMPANY.

No. 13350.

United States Court of Appeals
Third Circuit.

Argued April 3, 1961.

Decided Sept. 6, 1961.

James J. Phelan, Jr., Asst. U. S. Atty., Philadelphia, Pa. (Walter E. Alessandroni, U. S. Atty., Philadelphia, Pa., on the brief), for appellant.

Hal F. Doig, Philadelphia, Pa. (Roy W. Johns, Harry Rosenblum, Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge and McLAUGHLIN and HASTIE, Circuit Judges.

BIGGS, Chief Judge.

The plaintiff-appellant, Shanahan, brought suit against the defendant-appellee, Atlantic Refining Company, asserting that he is entitled to reemployment by the Atlantic with seniority from September 25, 1941, pursuant to the provisions of the Universal Military Training and Service Act, as amended, 50 U.S. C.A.Appendix, § 459, subsections (a) and (b), but because Shanahan left the employment of Atlantic for induction into the Armed Forces of the United States on or about August 4, 1942, his rights are governed, not by the Act just cited, but by Section 8 of the Selective Training and Service Act of 1940, as extended by the Service Extension Act of 1941, 50 U.S.C.A.Appendix, § 308.[1]

Two issues are presented for our consideration: (1) whether Shanahan left a position "other than temporary," and (2) whether Shanahan's suit is barred by a statute of limitation or by laches. A review of the proceedings and of some of the evidence is required.

The following findings of fact, as made by the court below, are fully supported by the evidence except as indicated hereinafter. Atlantic is in the business of refining, transporting and selling petroleum and similar products and possesses a large plant and storage facilities at Philadelphia. It has a number of departments in its plant and many employees. When a department has need of additional manpower the supervisor of that department sends an employment requisition slip to Atlantic's Personnel Department, stating the number of persons needed, the date on which each man will be required, the job titles, the wage rates or salaries and whether the requisitioned men will be replacements or additions to the work force, as well as the educational and any other special requirements. The form also specifies whether the job is to be a "permanent" or a "temporary" one.

From sometime prior to September 25, 1941, Atlantic has had two classes of employees, which it designates as "temporary" or "permanent." The temporary employee is hired to do a specific job, usually of short duration. The permanent employee, barring unforeseen ad-

---

1. Section 8(b) of the Selective Training and Service Act of 1940 as extended, provides: "In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer * * * (B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so * * *."

verse economic changes, is expected to continue indefinitely on Atlantic's payroll. The number of the permanent working force is set by Atlantic itself. Atlantic decides when a temporary employee shall become permanent. When a change in classification from "temporary" to "permanent" is made, a notation is placed in the company's records and the employee is notified officially of this purported change in status. No promotion, pay raise or change of job generally accompanies a change in classification. When Atlantic classifies an employee as permanent it computes his seniority from the date the employee started to work whether as a permanent or a temporary employee provided the prior employment was fairly continuous. Atlantic asserts that it has an unrestricted right to hire any person as an employee and discharge any employee who has been employed by it as a "temporary" employee or any other employee who has been employed for a period of less than one year.

World War II required the employment of additional manpower at Atlantic's Philadelphia plant. In response to an employment requisition from the Package Department, dated September 22, 1941, asking for two temporary employees to work as replacements for two months, Atlantic's Personnel Department employed Shanahan for the first time on September 25, 1941. He was assigned a job as a shop hand in the Package Department to be paid at the rate of 72 cents an hour. When he was hired he was told that he was a temporary employee and that his job would last for approximately two months. Shanahan could not have expected permanent or continuous employment for he knew that he would be requested to enter military service in the near future. Though informed that his employment would last only two months in fact it lasted until

February 8, 1942. On February 9, 1942, pursuant to an employment requisition from the Maintenance Division of Atlantic's refinery requesting a temporary employee with a high school education to act as a replacement for six months Shanahan was transferred to the refinery as a laborer at the rate of 81 cents an hour. The requisition slip stated: "It is desired that a man of the 'Bumper' [2] type be furnished on this requisition. He should be capable of moving up to fill vacancies of varying duration in the operating group." About the end of March 1942, Shanahan received his first promotion.

On April 6, 1942, pursuant to a requisition of the Sales Department dated March 30, 1942, he was transferred to the Belmont section of the plant on a job which was to last three months to replace a man who was then entering military service. On June 1, 1942, Shanahan was returned to the Maintenance Division to replace a man who had been drafted into military service. The requisition slip did not state how long this job should last. On July 27, 1942, he was transferred to the Naphtha Division to replace a man who had been sent to one of Atlantic's subsidiary companies.

The 10th Finding of Fact is as follows: "Each time he [Shanahan] was transferred to a different assignment, plaintiff was not considered as a new employee by the defendant. He was not separated from the employment relationship at the conclusion of each job because as the work ran out there were other capacities to be filled in other parts of the plant. Therefore, he was given an opportunity to accept the new job rather than have him separated [from employment] one day and hired the next."

On August 3, 1942, after being employed "continuously" [3] for ten months, Shanahan was accepted for military

2. "A bumper means this; we have a unit with a 5-man shift that works seven days a week, twenty-four hours a day, three shifts a day. Obviously, those people have to get their days off. A bumper is a man who moves up and take a position

which allows the rest of the shift to move up and get their days off." Transcript of Testimony, p. 137.

3. The term "continuously" was employed by the trial judge. As will have been observed there were several intervals of a

service. On the following day he was separated from his employment with Atlantic and inducted into the United States Army. There is no doubt that Shanahan's supervisors considered his ability and attitude to be good.

Every one of Atlantic's "Employment Requisition Slips" in evidence shows that Shanahan was hired as a "Replacement" and that the employment was "Temporary". Driver, Atlantic's Manager of Personnel Administration, testified that it was the custom to inform a new employee of his status as "temporary" or "permanent" but that the "person who did originally employ him [Shanahan] is no longer with us [Atlantic]."

In accordance with Atlantic's rules, all employees, regardless of classification, employed by it for at least six months, are eligible to contribute to its pension fund. On March 25, 1942, plaintiff became eligible to contribute. On that day he voluntarily consented to contribute and deductions for this purpose were made from his wages. About this time Shanahan received his first promotion.

On December 20, 1945, Shanahan completed his military service. He was reemployed by Atlantic on January 9, 1946, as a temporary employee and was given a janitor's classification. At that time Shanahan was qualified to perform the duties of the position that he held when he left Atlantic's employ on August 4, 1942. Prior to Shanahan's reemployment, he signed a document which stated that he was a "temporary" employee. He was informed by Atlantic that his seniority rights would date no earlier than January 9, 1946, the date of his reemployment. Shanahan objected to Atlantic's position in this respect. On May 13, 1946, Shanahan was transferred to a pumper's position. On January 27, 1947, Shanahan was officially made a permanent employee by Atlantic and was formally notified to that effect. Atlantic used January 9, 1946, as the date for

calculating Shanahan's seniority. Six months later Shanahan elected to contribute to Atlantic's retirement fund and deductions have been made from his wages for his retirement benefits since that time.

The 18th Finding of Fact is as follows: "Other employees hired under circumstances similar to that of plaintiff, but who did not enter the military service, have had their seniority date from the time they were first hired. If plaintiff had not been inducted into the military service but had been continuously employed by the defendant since September 25, 1941, his seniority would have dated from that time."

Shanahan complained to his Union which brought the matter formally to the attention of Atlantic's Industrial Relations Committee in 1947, 1950 and 1951.

The provisions of the labor relations agreement governing the employment conditions between Atlantic and its employees conferred no seniority rights on Shanahan prior to the time he entered the military service. Shanahan's Union attempted on his behalf and on behalf of other employees of Atlantic similarly situated to negotiate a provision in the labor agreement which would have achieved for him and for the other employees seniority status based on the date of original employment but without success.

Later in 1952 Shanahan lodged a complaint with the Bureau of Veterans' Reemployment Rights. The Bureau discussed Shanahan's situation with Atlantic's Industrial Relations Committee but was not able to advance Shanahan's cause. According to the 21st Finding of Fact, about this time the Government put out a pamphlet on the reemployment rights of veterans. In 1953 the Department of Justice rendered an interpretive opinion, "favorable to the 'temporary' employees,"[4] but Atlantic disagreed with

few hours or more from time to time when Shanahan was not employed by Atlantic but these periods were of very short duration.

4. The Finding of Fact No. 21 is not specific. The pamphlet referred to is not in the record. This language is quoted from the finding of fact. The Department of Justice opinion is not in the record.

---

this opinion. On August 9, 1955, 9 years and 7 months after Shanahan was re-employed, the present suit was brought.

If Shanahan's seniority is calculated from September 15, 1941, according to the 24th Finding of Fact, "he would be put ahead of 669 persons on the seniority list of a work force of approximately 3,450 permanent hourly employees. The only present advantages which he would derive from such a calculation are a longer vacation period and an earlier priority in choosing that period, additional years of credit in the retirement system, provided he pays amounts into the fund which would have been deducted from his wages during those years, and possibly a promotion or two. The possible future advantages are a weight advantage in the competition for promotions and a position on relatively higher ground with respect to the flood waters of demotions, lay-offs or reductions in force."

■■ It must be conceded that the law on the issue of what constitutes "other than a temporary position" is not clear. The burden was upon Shanahan to show that his employment was in other than a temporary position. Howie v. Lance, Inc., 4 Cir., 1949, 172 F.2d 107. The permanency or lack of permanency of a position can be determined by what the employer and the employee mutually intended it to be. The test frequently employed is what did the parties intend at the time of the initial hiring. Was there an expectation of continuous hiring? Howie v. Lance, Inc., supra; Mouell v. Local No. 7635, D.C.S.D.W.Va.1948, 81 F.Supp. 151; Lord Manufacturing Co. v. Nemenz, D.C.W.D.Pa.1946, 65 F.Supp. 711. In the case at bar Shanahan clearly understood the temporary nature of his positions. He so stated in the course of his testimony. He signed a statement to that effect when he was reemployed after his military service. Atlantic carried him as a "temporary" employee on such of its records as it was able to produce in evidence. These records were made at a time unsuspicious. The finding of fact that Shanahan's employment was "continuous" is not supported by the evidence. In fact that evidence incontrovertibly contradicts that finding. Shanahan had a series of jobs, all of comparatively short duration. They were in fact temporary. We think that the court below in holding Shanahan's employment was "continuous" meant to indicate that there was no long interval of nonemployment by Atlantic between September 25, 1941, and August 4, 1942. The meaning of the phrase "position other than temporary" is a matter of legal interpretation and is subject to our determination. We conclude, as did the court below, that Shanahan's employment ending August 4, 1942, included no position other than temporary with Atlantic.

In so concluding, we have no need to reach the issue of the action being barred by a statute of limitations or laches.

The judgment will be affirmed.