Robert PRICE, Appellant,

v.

SS YARACUY, Appellee.

No. 23107.

United States Court of Appeals
Fifth Circuit.

May 25, 1967.

Rehearing Denied Sept. 20, 1967.

Garland R. Rolling, Metairie, La., for appellant.

Leon Sarpy, J. Dwight LeBlanc, Jr., Chaffe, McCall, Phillips, Burke, Toler & Hopkins, New Orleans, La., for appellee.

A. R. Christovich, Jr., Christovich & Kearney, New Orleans, La., for J. P. Florio & Co., impleaded respondent, appellee.

Before WISDOM and GODBOLD, Circuit Judges, and McRAE, District Judge.

GODBOLD, Circuit Judge:

Appellant Price, a longshoreman, filed a libel against the S/S Yaracuy[1] for personal injuries sustained while working in the hold of the ship. He alleged the ship was unseaworthy because provided with defective winches and improper personnel and that his injuries were caused by negligence of the employees of the vessel.[2] The District Court held the sole proximate cause of the accident was improper operation of the winch by an employee of the stevedore; the ship therefore was held not unseaworthy and the libel dismissed.

Price was working in the No. 5 hold of the Yaracuy. Loaded drums were being placed in the ship, lifted six at a time by two of the ship's winches. Controls for the winches were located on deck near the No. 5 hatch, on separate metal stands, each stand having on top a wheel turning in a horizontal plane, which controlled the speed of the electric motor that furnished motive power for lifting and lowering of the winch cable. The two wheels were 7' 8" apart, center to center, and the stands about four or five feet apart.

The stevedore furnished two operators for the winches, but they alternated, each running both winches for a period while the other rested or waited. (The accident happened while the first operator for the day was still in his first work period.) To operate the controls of both winches concurrently the operator bolted across the horizontal surface of each control wheel a wood arm known as a "stick", which extended outward, and when moved horizontally in lever fashion caused the wheel to turn. By use of these attachments the operator could position himself between the two control stands and by operating a stick with each hand control both winches simultaneously. With control wheels as far apart as those on the Yaracuy a pipe extension was added to one stick. The use of the sticks was customary at the port; the operators themselves made and furnished them. This particular stevedore allowed use of sticks if securely bolted to the control wheels.

During the first hours of work on the morning of the accident Perez, the ship's electrician, was advised (it is not clear by whom) that the winch at No. 5 hold was not operating properly, and he checked on it. It appears he found the operator, Leber,[3] was using the controls improperly and in a manner he considered negligent, causing the winches to "cut

---

1. The vessel was Venezuelan, Spanish was the language of at least some of the crew, here a factor of significance.

2. The stevedore's insurer intervened and the shipowner impleaded the stevedore.

3. A winch operator with 20 years experience.

out".[4] Leber advanced each control wheel too rapidly instead of pausing at each of four or five wheel settings or points, which caused the winch to pick up speed too fast. This would cause a circuit breaker to cut off the electric power to the winch, whereupon the winch brake automatically would take hold and the load stop where then in position. To restore power the control wheel had to be returned to its original zero setting and advanced again.

4. Significant parts of Perez's testimony are:

"A. I went to check it and found out that it was negligence on the part of the individual that was operating it.

Q. Did you find anything wrong with the winch?

A. The winchman called my attention to the fact that it stopped but in checking it I told him the reason for that was because he wasn't setting the points properly. The winch has various points of stoppingness but instead of stopping individually, he was simply throwing them all together.

Q. How do you know he was throwing them all together?

A. Because I know that is what was happening. From what he indicated was going wrong, it was that.

Q. From what who indicated?

A. The winchman.

Q. What winch at hold number five did this appertain to?

A. Number twelve.

Q. Is that the inshore winch or the hold winch?

A. The starboard winch.

Q. And that's the inshore winch?

A. Yes, toward port, the inshore.

Q. Did he find anything wrong with the winch?

A. I don't remember.

Q. Does he recall if there was any stoppage as a result of this incident—work stoppage?

A. No, there was none whatsoever.

Q. Did the winch continue operation the rest of the day?

A. Yes, sir.

Q. Is the same true of the port winch at hold number five? That is both regarding the balance of the day.

A. Yes.

Q. If there had been some mechanical difficulty with the winch, what would he have done?

A. I would have immediately notified the pilot on the bridge and made a notation to that effect.

Perez attempted as best he could to show Leber how to use the controls, but Leber spoke no Spanish, Perez no English, and Perez did not know whether the operator understood him. Although Perez considered that Leber's method of operating was improper and negligent he thought the matter too insignificant to report to any ship's officer or to necessitate that he get an interpreter to explain to Leber how the winches properly should be operated.[5] There was testi-

Q. Why, sir, did you not make a note in your electrician's log about the report of the faulty winch and your checking on it?

\*　\*　\*　\*　\*

MR. SARPY: I don't think that is proper. He didn't say there was a faulty winch.

THE COURT: Well, it could be reframed. Why didn't he put in his book that he had had a complaint about a stalling of winch at hold number five?

THE WITNESS: I didn't think it was necessary because it was so insignificant.

\*　\*　\*　\*　\*

Q. Now your previous testimony was that you had determined that the winch was being operated in a negligent manner and I now ask you if you reported to the captain or any of the ship's officers that there was a winch operator aboard your vessel who was negligently operating the winches?

A. No, I didn't inform anyone.

THE COURT: Would he like to explain why he did not?

THE WITNESS: As I stated before, I thought it was unimportant.

THE COURT: Did he show the operator how to operate the winch?

THE WITNESS: I tried to show him as best I could but he couldn't speak Spanish and I couldn't speak English. I don't know if he understood.

BY MR. ROLLING:

Q. Did you make any effort to get an interpreter so you could properly instruct him on how to operate the winch?

A. No, I didn't."

5. There was considerable confusion between witnesses over which occurrences during the morning involved one winch, and if so which one, and which involved both winches, and witnesses referred indiscriminately to the winch equipment by singular and plural. Because of the determination we make these differences are not material, since the method of operation by the winchman that Perez considered improper and negligent was common to both units.

mony that after this visit to the scene Perez himself gave the loading crew a signal that it was all right to go back to work.[6]

Later in the morning but before the accident, Leber told Matthews, another employee of the stevedore, that the winches were cutting out. Shortly before Price was hurt one of the winches cut out, and Leber sent Matthews to get Perez.[7] Matthews reported the situation to the electrician as requested, but Perez did not come to the scene.[8] Matthews then reported the situation to the superintendent who went looking for Perez. Meanwhile work at No. 5 hatch stopped for eight to ten minutes. Then Leber "fooled with" the handle and found the stopped winch would run. He went back to loading. Shortly thereafter, and before Matthews got back to the hatch, one of the winches made a noise and cut out, which caused the load to swing round, spin like a top, and strike Price.

Price was lifted from the hold on a board raised by the two winches, each operated by a separate operator, and without trouble. In subsequent loading that day Leber had "a little trouble with [the winches] now and then", with them "kicking off". In at least some of the work carried on during the rest of the day two operators were used concurrently, one on each control stand. The sticks were not removed from the control wheels and were continued in use.

■ Appellant does not take issue with the District Court's ruling that operational negligence of otherwise seaworthy equipment by a fellow longshoreman does not make a vessel unseaworthy. The District Court correctly stated the law of this circuit. Antoine v. Lake Charles Stevedores, Inc. et al., 376 F.2d 443 (5th Cir., 1967). See also Judge Hunter's extensive discussion in the District Court opinion in the same case. 249 F.Supp. 290 (W.D.La., 1965).[9]

■ The unsettled issue is whether there was negligence by the ship's crew which contributed to the longshoreman's injury and for which he is entitled to recover under general maritime law.[10] A person working on a ship for an independent contractor or otherwise rightfully transacting business on the ship can recover under general maritime law

---

6. There was some testimony that Perez "worked on" or "fooled with" one or both winches.

7. Matthews was flagman or derrickman at the hatch and as such a safety man of sorts to whom others reported if anything was going wrong, and he in turn would notify the superintendent.

8. Matthews implied, though it is not clear, that he had difficulty communicating with Perez.

9. A ship may be rendered unseaworthy by the failure to provide a competent crew. Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962). But seaworthiness requires only that the vessel be manned by an adequate number of men who know their business. "There is no requirement that no one shall ever make a mistake. If someone is injured solely by reason of an act or omission on the part of any member of a crew found to be possessed of the competence of men of his calling, there can be no recovery unless the act or omission is proved to be negligent." Waldron v.

Moore-McCormick Lines, Inc., 356 F.2d 247, 251 (2nd Cir.) cert. granted, 385 U.S. 810, 87 S.Ct. 59, 17 L.Ed.2d 52 (1966). This record contains no evidence that any of the crew members were not possessed of the competence of men of their calling—liability, if it exists, must be based on negligence.

10. The circumstances of an injury may constitute negligence but not unseaworthiness. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 418, 74 S.Ct. 202, 209, 98 L.Ed. 143, 155 (1953) (concurring opinion). Cf. Vickers v. Tumey, 290 F.2d 426 (5th Cir., 1961), contrasting unseaworthiness with negligence under the Jones Act, 46 U.S.C.A. § 688. "Negligence and unseaworthiness are not equivalent. A finding of negligence is neither a substitute foundation for, nor a finding of unseaworthiness." Royal Mail Lines, Ltd. v. Peck, 269 F.2d 857, 860 (9th Cir., 1959). And, we add, a finding of seaworthiness is not a substitute for, nor necessarily the same as, a finding that there is no actionable negligence under general maritime law.

for negligence of the shipowner, even if he also shares with crew members the right to sue for unseaworthiness. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).[11] A libel by a longshoreman for negligence resulting in injury to him while aboard ship and engaged in loading operations is within admiralty jurisdiction under 46 U.S.C.A. § 740, Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963).

The ship has no duty to actively supervise loading work, but if the ship has knowledge of a condition dangerous to the longshoremen or, in the exercise of ordinary care it would have had such knowledge, it owes them a duty to use reasonable care to prevent injury to them. Gutierrez v. Waterman Steamship Corp., supra; Albanese v. N.V. Nederl. Amerik Stoomv. Maats, 346 F.2d 481 (2d Cir.), rev'd on other grounds, 382 U.S. 283, 86 S.Ct. 429, 15 L.Ed.2d 327 (1965); Misurella v. Isthmian Lines, Inc., 328 F.2d 40 (2d Cir., 1964). For example, a shipowner may be guilty of negligence in failing to forbid an unsafe method of discharging cargo. Ferrante v. Swedish American Lines, 331 F.2d 571 (3rd Cir.) cert. dismissed, 379 U.S. 801, 85 S.Ct. 10, 13 L.Ed.2d 20 (1964); Hroncich v. American President Lines, Ltd., 334 F.2d 282, 286 (3rd Cir., 1964). Obviously the same principle governs unsafe methods of loading. Cf. D/S Ove Skou v. Hebert, 365 F.2d 341 (5th Cir., 1966).[12]

We need not discuss all the substantial evidence of various forms of negligence by the ship, but we will mention some that we think significant. Perez failed to report or halt operations of the winch controls in a manner he ob-

11. Compare the contrary view of Mr. Justice Frankfurter presented in his concurring opinion. 346 U.S. at 414, 74 S.Ct. at 207, 98 L.Ed. at 153. We are not here concerned with a crew member's right to sue his employer (the shipowner) for negligence, which is based not on general maritime law but on the restricted remedy of the Jones Act, 46 U.S.C.A. § 688. Also note that the Jones Act is unavailable to a longshoreman in a suit against the shipowner, who is not his employer, Kyles v. James W. Elwell & Co., 296 F.2d 703 (7 Cir. 1961), cert. denied, 369 U.S. 852, 82 S.Ct. 936, 8 L.Ed.2d 10 (1962). Since the passage of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., the Jones Act generally is unavailable to a longshoreman in a suit against his stevedore-employer, Swanson v. Marra Bros., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946).

12. The Second Circuit has taken the view that the ship must have actual knowledge of the dangerous condition and even where such knowledge exists there may be no liability if the ship has no duty to actively supervise the operations of the stevedore. See cases collected in Skibinski v. Waterman Steamship Corporation, 242 F.Supp. 290, 299 (S.D.N.Y., 1965). But in Albanese v. N.V. Nederl. Amerik Stoomv. Maats., supra, the Court of Appeals for the Second Circuit reversed a verdict for a longshoreman on the ground the jury charge on negligence erroneously permitted a finding of liability based on existence of a dangerous condition for a sufficient length of time to charge the ship with notice thereof. "When a shipowner hires a qualified stevedore to load the vessel the standard of due care does not require that he actively supervise the stevedore's work or that he take available steps to rectify a dangerous condition created by the stevedore which he does not know to exist." 346 F.2d at 483. The Supreme Court reversed on the authority of Gutierrez v. Waterman Steamship Corp., supra, and reinstated the District Court judgment. 382 U.S. 283, 86 S.Ct. 429, 15 L.Ed.2d 327. Thus the Supreme Court seems to have approved the "known or should have known" approach used by the Third Circuit. See Ferrante v. Swedish American Lines, supra; Knox v. United States Lines Company, 294 F.2d 354 (3rd Cir., 1961) (vacated on other grounds at 294 F.2d 360). The degree of control retained by the ship and the activities the crew normally are engaged in during the stevedore's operations are factors in weighing whether in the exercise of due care a ship without actual knowledge should have been aware of the dangerous condition. See Brabazon v. Belships Co., 202 F.2d 904, 907–908 (3rd Cir., 1953).

served and thought improper and negligent, considering the matter insignificant. He attempted to instruct Leber in the proper manner of operating the winches, but left the scene without determining whether, over a language barrier, Leber understood him.

The testimony of the owner's marine expert was that the winches were so located that safety required an operator for each. All loading during the morning, with knowledge of ship's officers, had been with one operator.[13] At some time after the accident two-man operation began and was continued throughout the day. Leber explained this as "By that time we didn't want to take no more chances with that winch."

There is evidence that the use of sticks and extension was itself improper and negligent, other evidence that "winch control extension levers" were a violation of "Safety and Health Regulations for Longshoremen" of the United States Department of Labor, unless provided by either the ship or the employer, and these were not. At no time did anyone on the ship's crew direct that sticks or extensions not be used. The ship had no formal regulation against use of a pipe extension, but ship's policy was that it was up to the officer on watch to call attention to the fact it should not be used because it might damage the equipment.[14] The first mate, who was deck officer watching the loading, observed operation of the winches before the accident and gave no such warning.[15]

Reversed and remanded for hearing on the issue of whether there is liability under general maritime law based on negligence by the ship's crew contributing to the libelant's injury.

13. One or two witnesses referred to use of two operators at a time during the morning. But all other witnesses, including the operators themselves, make clear only one worked at a time.

14. While the testimony on ship policy appears to relate only to the extension, it is not entirely clear that it did not relate also to the sticks themselves, for the ship's objection was grounded on use of an item that was not an integral part of the winch equipment.

15. There was evidence both ways on whether the winch that cut out and caused the injury to Price was the one on which the pipe extension was in use.