**Rufus HENDON, Plaintiff,**

v.

**MARATHON–LeTOURNEAU and Reading & Bates Offshore Drilling Company, Defendants.**

**Civ. A. No. W74–10(R).**

United States District Court, S. D. Mississippi, W. D.

April 19, 1976.

Lee Davis Thames, Bobbie D. Robinson, Vicksburg, Miss., for plaintiff.

William G. Beanland, Vicksburg, Miss., for defendants.

## OPINION

DAN M. RUSSELL, Jr., Chief Judge.

Plaintiff, Rufus Hendon, a resident of Vicksburg, Mississippi brought this maritime action under Rule 9(h), Federal Rules of Civil Procedure, against Reading & Bates

Offshore Drilling Company, a Delaware corporation authorized to do business in Mississippi, herein called R & B, for injuries he received when he fell from scaffolding aboard R & B's submersible, off-shore drilling rig vessel [1] known as the Chris Seger, as he was performing repair work prior to the vessel's being towed to its oceanic drilling site. Plaintiff charges that the scaffolding was unsafe and did not meet the standards required by the Occupational Safety and Health Act, 33 U.S.C. § 941, as set forth in OSHA Regulations # 1915.41 and 1915.47 (29 C.F.R. # 1915.1 et seq.), and as a result of its unsafe condition, plaintiff fell, receiving serious and permanent injuries. Plaintiff charges that the Chris Seger was unseaworthy by reason of the defective or insufficient scaffolding and, alternatively, that R & B was negligent in its failure to furnish him a reasonably safe place to work including the insufficiencies of the scaffolding. Plaintiff, in the same action, also sued his employer, Marathon-LeTourneau, a Delaware corporation domiciled in Mississippi, herein called LeTourneau, claiming Jones Act negligence (46 U.S.C. § 688, et seq.).

In his post-trial brief, plaintiff's counsel concedes that the Jones Act claim against LeTourneau, plaintiff's employer, should be dismissed in that the facts developed during the trial reflected that the vessel, at the time of plaintiff's injury, was under the control of R & B. The Court agrees that plaintiff's claim against LeTourneau should be dismissed inasmuch as LeTourneau was not the owner of the vessel, nor was plaintiff a member of her crew. It also appears that plaintiff, as an employee of LeTourneau, has accepted benefits under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901, et seq., and has a claim which LeTourneau admits is still pending.

Plaintiff claims the status of a Sieracki seaman,[2] which, as well as a myriad of subsequent cases, holds that the warranty of seaworthiness applies to shore-based workers while on board ship and performing work traditionally done by seamen. However, as stated in the fairly recent decision of the Fifth Circuit Court of Appeals, *Hodges v. S. S. Tillie Lykes,* 512 F.2d 1279: "If a vessel is not in navigation, the owner owes no duty of seaworthiness to seamen or those enjoying Sieracki seaman status. *Roper v. United States,* 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961); *West v. United States,* 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959); . . . In determining the status of the vessel, inquiry should focus on the extent of repair operations and on who controls those operations. *Erwin v. Lukes Brothers Steamship Co.,* 472 F.2d 1217 (5th Cir.1973)." Also see *Rogers v. U. S.,* 5 Cir., 452 F.2d 1149.

Inasmuch as R & B denies that the Chris Seger was in navigation and hence owed plaintiff no duty of seaworthiness, it is necessary to examine in detail the extent of her repairs and which party was in control of same at the time of plaintiff's injury, as well as plaintiff's status.

■ Before doing so, the Court notes certain affirmative defenses in the pleadings which were not advanced prior to nor during the trial, but some of which are argued in R & B's brief. In its answer R & B objected to venue, which objection the Court deems as waived inasmuch as R & B proceeded to trial without having raised the issue. R & B admitted jurisdiction pursuant to Rule 9(h), but denied that diversity of citizenship existed between the parties or that plaintiff had a Jones Act claim against it. Actually the Jones Act claim was asserted against LeTourneau and not against R & B. Although LeTourneau has its principal place of business in Mississippi, that part of the pre-trial order entered into evidence reflects that LeTourneau was incorporated in Delaware. With LeTourneau out of the case, there is no question but that diversity exists between plaintiff and

---

1. In *Guilbeau v. Falcon Seaboard Drilling Co.,* D.C.La., 215 F.Supp. 909, a submersible drilling rig was defined as a special purpose craft, designed for occupations offshore and was held to be a vessel.

2. *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

R & B, and plaintiff's claim is in excess of $10,000.00. However, even prior to plaintiff's admission that he had no claim against LeTourneau, this Court is convinced that it had maritime jurisdiction over plaintiff's asserted claims of unseaworthiness and negligence against R & B, inasmuch as his injury was received on board the Chris Seger at a time when it was in navigable waters. Confer *Delome v. Union Barge Line Company,* 5 Cir., 444 F.2d 225, and *Price v. S S Yaracuy,* 5 Cir., 378 F.2d 156, wherein it was held that a libel by a longshoreman for negligence resulting in injury to him while aboard ship and engaged in loading operations is within admiralty jurisdiction pursuant to the Extension of Admiralty and Maritime Jurisdiction Act, 46 U.S.C. § 740, citing *Gutierrez v. Waterman Steamship Corp.,* 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297. Although in *Delome* and *Gutierrez,* the injuries occurred on land adjacent to the vessel, jurisdiction being asserted under the Extension Act, there is an implication that jurisdiction is present for injuries occurring on a vessel in navigable waters, which is the holding in *Price.* R & B also contends that inasmuch as the injury occurred in Louisiana, plaintiff's claim was barred by Louisiana's one year statute of limitations. Under federal admiralty jurisdiction, there is no statutory limitation period, the applicable test being that of laches. *Pinion v. Miss. Shipping Co.,* D.C.La., 156 F.Supp. 652. The Court will later comment on whether plaintiff timely filed his suit.

Marathon-LeTourneau is assertedly the world's largest manufacturer of portable, jack-up type, offshore drilling platforms. It constructed such a vessel, the Chris Seger, at its yard in Vicksburg in 1957. R & B is an offshore drilling company engaged in the exploration of oil and gas both offshore and onshore. It owns and operates several portable, jack-up type drilling platforms, some manufactured by LeTourneau, and at the time of plaintiff's injury owned the Chris Seger. The Court adopts in toto defendant's description of this rig as follows:

"The CHRIS SEGER is a typical LeTourneau design; triangular in shape with three jack-up legs, one at the bow (apex) and two at the stern (base). The hull is two decks deep. The lower deck accommodates diesel engines and generators for electric power, drilling mud storage, mixing tanks and pumps, fuel and water tanks, etc. The main deck accommodates the living quarters, a three story structure housing 65 plus men just aft of the bow leg, the drill pipe rack being amid-ships, and the derrick, draw works, rotary table and associated drilling equipment located at the stern. Drilling operations are conducted through a slot built into the stern, which is flanked by sponsons or watertight hull extensions to increase bouyancy. The legs are themselves triangular. A rack and pinion mechanism elevates and lowers the legs. The rack is a long piece of heavy steel with teeth along its entire length affixed to the outer edge of each corner of each triangular leg. The pinion is a small but heavy steel gear with teeth to match and enmesh with those of the rack. It is connected through a gear train unit to an electric motor inside a gear box or housing. Each gear unit contains a set consisting of a motor, gear train, and pinion. Prior to the renovation involved in this case, the CHRIS SEGER had three such gear units at each corner of each leg, stacked one on top of the other, thus a total of 27 elevating units. The gear units are an integral part of the hull; partially in the tweendeck space, partially topside, but immovable and firmly attached to the hull.

To drill for oil or gas the CHRIS SEGER is towed to a potential location with its legs elevated. There the electric motor in the gear units are activated, each driving its accompanying pinion against its attendant rack—three legs, three corners each, thus nine corners, nine racks, twenty-seven sets of motors, gears and pinions, moving in concert. The legs are thus lowered through wells in the deck until their ends touch or penetrate into the ocean floor. At the leg ends are large cylindrical spud cans or feet approximately 32 feet tall and 35 feet in

diameter which permit the platform to obtain a firm footing or stance upon the ocean floor. The electric motors continue to operate their pinions against their attendant racks thus causing the hull to climb up the legs or to elevate out of the water until a distance above the water of about 40 feet is reached, thereby isolating the hull from wave action and permitting drilling upon a steady and stable platform. In the event waves, because of hurricanes or high winds, exceed the air gap distance, the barge simply climbs further up its legs to escape them and continues drilling. Upon completion of drilling, the barge climbs down its legs, retracts its feet from the ocean floor, raises its legs through their leg wells and seeks a tow to another location.

The CHRIS SEGER originally had the capability to drill in water depths of approximately 80 feet. Its legs were 145 feet long. Its original cost was $2,500,-000.00. It took 200,000 man hours to build and its original gross weight was 4000 tons. Ultimately, the CHRIS SEGER was purchased by Reading & Bates Offshore Drilling Company which did some renovation work to the rig at Jacintoport, Texas, in 1970, including installation of sponsons on the starboard and port sides of the hull in order to increase the hull's bouyancy or load carrying capacity."

In March 1971, LeTourneau and R & B entered into a contract for extensive renovations and additions to the rig. Essentially, new legs, approximately 243 feet long, were to be fabricated and installed in order for the rig to drill in deeper water. This installation required the addition of nine new gear units, one at each corner of each leg on top of the existing units, with guides, stabilizers and bracing above and below deck; the installation of 17 new primary gear boxes for the elevating gear units; fabrication and installation of diagonal trusses within the hull to strengthen it; the fabrication and installation of nine new guide structures, three on each leg, to accommodate the longer and heavier new legs; the fabrication and installation of he-

liport supports and a heliport deck capable of supporting a Sikorskey S–61 helicopter. Additionally the contract called for LeTourneau to perform other work on a time and material basis, including the repair of the 27 existing gear trains; the fabrication and installation of a water jet piping system in each leg to assist the vessel in extracting its feet from ocean mud; the installation of two new "P" tanks within the hull; and the furnishing and installation of a new shipboard crane, and the repair and relocation of two existing cranes. Most of this work was completed at Vicksburg. Inasmuch as it would have been impossible for the rig with all of the contemplated leg extensions to clear river bridges downstream, another contract was entered into on January 25, 1972, for the installation and erection of approximately 100 feet of the legs not erected at Vicksburg, the piping system which extended the length of the legs, and such other work, as R & B might request on a time and material basis. Both contracts are in evidence. All of the work performed under these contracts was at a cost to the owner in excess of $1,300,000.00. Over 81,-000 manhours were expended in the project and over 700 tons of new steel were added to the gross weight of the rig. Prior to the renovation, the Chris Seger had a capability of oil and gas exploration at depths of 80 feet. Upon completion of the renovation, the rig had a capacity of drilling in water up to 150 feet in depth, of operating with wind forces up to 125 miles per hour and above storm waves of 43 feet, trough to crest, and when the legs were fully elevated, to hold steady even though the hull rolled or pitched 20 degrees in intervals of a few seconds. It could support the drilling derrick and its associated equipment, as well as a 1,000,000 pound derrick hook load and a 350,000 pound set back load, and provide buoyancy for variable loads of up to 2,500,000 pounds.

LeTourneau began its contractual preparations in late March 1971. The rig was towed up river to Vicksburg, arriving November 9, 1971. After work was completed at Vicksburg, the rig was towed downstream below the bridges at New Orleans,

the LeTourneau crew arriving at Belle Chasse, Louisiana on February 24, 1972, where the rig was moored approximately 200 feet off a landing and where the remaining work was done by the LeTourneau crew. This crew was divided into a twelve hour day and night shift of 27 welders, three pipefitters and a foreman, each crew consisting of 31 men. Plaintiff, with approximately seven years' experience as a journeyman welder with LeTourneau, was a member of the day shift. The leg erection called for nine or ten men to work on each leg, three welders at each corner of each leg to weld the leg sections, approximately 33 feet in length, as they were lifted into place by a crane, with a pipe cutter or fitter for each leg, to assist the welders. The LeTourneau crew slept and was fed aboard the Chris Seger.

A full R & B crew in charge of a tool pusher, had also come aboard to prepare the rig for its overseas tow. Using the rig's motors, this crew also raised the deck level as the leg extensions were added by the LeTourneau crew. However, by contract, LeTourneau, as an independent contractor, had full and exclusive control over the methods, means and details of its performance in completing the leg extensions and remaining renovation items, including the installation of the water jet piping system in each leg; the only relation between the LeTourneau crews and R & B's tool pusher and crew was the periodic raising of the deck to a height and level specified by the LeTourneau foreman in order for his crews to fit and weld the leg extensions and accompanying trusses or braces as they were added on. The LeTourneau crews worked under the orders of their foreman, George Lynn, and the project director, Robert Ivy. They took no orders or directions from R & B's crew or its tool pusher. LeTourneau furnished all materials, supplies, tools and equipment for the work contracted for. Included were welding machines, welding rods, and leads, oxyacetylene torches, carpenters' tools, leg parts, and the jet piping system parts and crane parts. LeTourneau also sent nine one-man "throat" scaffolds to the rig. These were wire baskets with large hook-like devices, designed to be placed on the inside of the triangles of each leg, hooked to the brace pipes, and suspended therefrom, accommodating a welder in order for him to make a substantial weld across the inside or "throat" of each corner of each leg. Generally three welders were assigned to each corner of each leg. One welder was stationed inside the scaffold basket at the throat of the leg and two welders were outside the corner performing their welding while standing upon the flat surface of the gear unit at that leg. To complete a welded connection at each corner required the three welders to work for approximately 12 hours. Standing by to assist was a pipe cutter-fitter to "wash out" the welds with an oxyacetylene torch or to do miscellaneous fitting or cutting about the joint.

On plaintiff's second day of welding, February 25, 1972, after the first 33 foot leg extensions were crane-lifted in place, but not completely welded, plaintiff and two other LeTourneau welders, Billy Ray King and Charles Wilkerson, were welding the brace pipe to the outboard corner of the starboard leg. This required a weld completely around the leg with billets added in strategic places. Plaintiff was in the "throat" of the corner in one of the basket scaffolds, facing the apex of the triangle. King was to plaintiff's left and Wilkerson to his right, both standing outside the triangle on the gear unit, the surface of which was about 12 feet higher than the main deck of the rig. According to plaintiff, all wooden or board scaffolds had been removed from the rig prior to its tow from Vicksburg, and none were included in the items sent by LeTourneau to Belle Chasse. However, plaintiff testified that he was unable to reach from inside the basket scaffold all of the weld he was trying to complete, and that his foreman had told him to use a board scaffold which he and Wilkerson broke out of a bundle which was part of the vessel's gear. A member of the vessel's crew assisted in sawing this board to a length that would fit into the basket scaffold at one end and span across to a leg brace. How long this board had been in

place when plaintiff fell from it is not reflected by the evidence. Be that as it may, about 2:30 p. m. on his second day of welding and while plaintiff was in the throat basket, the cutter-fitter, Robert Burgess, climbed to the level, where plaintiff was, to attach a length of metal ladder to the inside of the starboard leg. In order to do this, Burgess needed to enter the throat scaffold plaintiff was in. Plaintiff accommodated Burgess by stepping out on the nearby board scaffold. In response to a request from Burgess for plaintiff to hand him a billet, weighing approximately 35 pounds, plaintiff lost his balance and fell some 35 feet into the water. The board scaffold, 12″ x 12″ wide, and some 6 to 8 feet long, was not fastened at either end, but was merely laid with one end in the throat scaffold and the other on a brace. It had no toehold or backrail, nor were any safety lines or nets present for the safety of the LeTourneau crew. Additionally plaintiff wore no life jacket, but was in fact weighed down by winter clothing, his hard hat, welding gear and line that extended to the deck. After falling, plaintiff swam to the scaffold board which had fallen with him and floated downstream some distance before being picked up by a small boat which threw him a line and carried him to the shore bank.

Both Wilkerson and King who formed a welding team with plaintiff and who were standing on the gear box when plaintiff fell, corroborated plaintiff's testimony that all LeTourneau's wooden scaffolding was removed from the vessel when it left Vicksburg; that it was necessary in welding around the leg, the weld being strengthened by the addition of billets or gussets, to use a board scaffold in order to complete the weld; that the board scaffold used by plaintiff was furnished by the crew of the vessel, and that there were no handrails, safety lines or nets available.

Plaintiff claims that the Chris Seger was in navigation at the time of his fall and that the vessel was unseaworthy due to the lack of adequate scaffolding or other safety devices. The contract job in comparison to the whole was nearly completed, the vessel was in navigable waters, with its crew aboard, under the command of the vessel's tool pusher, readying her for the tow to oceanic waters. All pumps and engines were in working order, and water and electricity used by both crews were furnished by the vessel. Under the criteria expressed in *Hodges, Roper, West,* and *Rogers,* cited above, plaintiff contends that at the time of plaintiff's fall, the Chris Seger was a "live" ship, for all practical purposes, ready to undertake her mission of under water oil exploration after being towed to the designated area. On the other hand, evidence on behalf of R & B reflects that the vessel was dead in the water. Not only had the legs not reached their intended length, the water piping system had not been installed, nor had the derrick been erected. She was not in a work ready status to resume underwater oil exploration. Further R & B contends that plaintiff was the employee of LeTourneau alone, was not a borrowed employee, and was engaged in work under the sole direction of LeTourneau, work that was specialized and not performed by the vessel's crew or akin to any welding that the vessel's crew might perform in aid of the vessel's mission.

In *Delome,* cited above, Circuit Judge Dyer of the Fifth Circuit, held that in determining whether a warranty of seaworthiness is owed shoreside workers, an examination of three status-oriented factors is essential, saying the focus is on "the status of the ship, the pattern of repairs and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen is doing on ship board at the moment of injury", the quoted language being cited from *West,* supra, and referred to in *Watz v. Zapata Off-Shore Co.,* 5 Cir., 431 F.2d 100, 108, and *Moye v. Sioux City & N. O. Barge Lines, Inc.,* 402 F.2d at page 240. His conclusion was that a precise definition of the phrase "in navigation" is impossible, the navigational status remaining a question of fact. In *Waganer v. Sea-Land Service, Inc.,* 486 F.2d 955, Circuit Judge Simpson of the Fifth Circuit,

commented that while Sieracki extended the seaworthiness warranty to shore-based workers who were on board ship and performing work traditionally done by seamen, *West* limited its application to "ship's work", which Judge Dyer equated with the following requirements: "(i) the ship in question must have been in navigational status, and not 'dead', which in turn depends upon whether the contracted work is minor or major, and who has custody and control of the ship while the work is being done; and (ii) the pattern of repair must reflect work traditionally and ordinarily done by seamen, excluding persons performing such tasks as making major repairs requiring dry docking or special skills." In distinguishing between major and minor repairs, Judge Dyer said a primary touchstone is the purpose for which the vessel has been idled. On the facts in the case sub judice, all of the renovations, which were major, would have been completed at the Vicksburg LeTourneau yard, except for having to allow for the height of bridges below Vicksburg. Although a comparatively minor part of the work remained to be done at the time of plaintiff's accident, the ship had not been released to its owner, was not ready for towing to ocean waters, nor in the absence of the derrick and water piping, did it have the capacity to accomplish its mission—that of drilling for oil. There is no dispute but that the remaining work to be done was under the sole control of the LeTourneau crew, its foreman, and project engineer, and not under the control of R & B's tool pusher, whose sole contact with the LeTourneau crew was in elevating the deck as the legs and accompanying paraphernalia were extended upward. The R & B crew was under the sole direction of the tool pusher with their own functions to perform, wholly unrelated to the work of the LeTourneau crew. Finally, even though the complex nature of modern ships and special type craft such as the Chris Seger, has broadened the range of seamen's duties far beyond that traditionally done,

the welding being done by the LeTourneau crew was not of the kind ordinarily performed, when necessary, by the R & B crew.[3] This plaintiff admitted. The fact was also in evidence that LeTourneau workmen, including plaintiff, were often called to underwater drilling rigs in waters remote from Vicksburg to make repairs requiring special skills that the vessels' crews were unable to perform. Accordingly, the Court finds that the Chris Seger was not in navigation at the time of plaintiff's injury, and owed him no warranty of seaworthiness.

■ The Court has come to a different conclusion regarding plaintiff's negligence claim against R & B—that is, that R & B owed him the undelegable duty to furnish a reasonably safe place to work and reasonably safe appliances—not unsafe scaffolding and lack of safety measures which are in violation of OSHA regulations. In this respect negligence is ordinarily based on different concepts from that of unseaworthiness. In response to this claim R & B contends that it had no control over LeTourneau's crew, its methods of work, or materials, including the scaffolding—all this was to be furnished by LeTourneau. And further, that the OSHA regulations are directed to plaintiff's employer, and are not binding on the owner of the vessel. In both contentions with respect to the facts here the Court disagrees. It goes without saying that LeTourneau was at fault in failing to furnish its crew with adequate scaffolding and safety appliances, all in violation of the safety regulations. However, under the Longshoremen's and Harbor Workers' Compensation Act, plaintiff's claim against LeTourneau is not dependent on LeTourneau's negligence.

In *Johnson v. Oil Transport Company,* 440 F.2d 109, in treating a negligence claim based on faulty scaffolding on a dock side, Circuit Judge Ainsworth of the Fifth Circuit, noted that scaffolding was not only not on the vessel itself, but had been fur-

---

3. But see Judge Brown's dissenting opinions in *Johnson v. Oil Transport Company,* 5 Cir., 440 F.2d 109, reh. den., 5 Cir., 445 F.2d 1402.

nished by plaintiff's employer, not the ship-owner, and plaintiff's work, at the time the scaffolding failed, was wholly under the control of plaintiff's employer. He sustained the lower court's dismissal of the negligence claim. However, under other circumstances other decisions in this Circuit have held that the overriding duty of a vessel owner to furnish a reasonably safe place to work may sustain a charge of negligence even when an unsafe condition was contributed to by reason of the repair work. In *Stark v. U. S.,* 413 F.2d 253, where both unseaworthiness and negligence were charged to the United States even though the ship had been withdrawn from navigation and placed in the full custody and control of another, the Fifth Circuit Court of Appeals set aside a summary judgment granted by the lower court, holding: "The crucial time is the time of the creation of the dangerous condition or latent defect. Whether due care under all the circumstances was used by the United States at relevant times, and to what proportion, if any, others might have been at fault, are questions of fact to be determined by the fact finder after a full trial."

In *Price v. SS Yaracuy,* supra, it was stated that "the ship has no duty to actively supervise loading work, but if the ship has knowledge of a condition dangerous to the longshoremen or, in the exercise of ordinary care it would have had such knowledge, it owes them a duty to use reasonable care to prevent injury to them. . . . For example, a shipowner may be guilty of negligence in failing to forbid an unsafe method of discharging cargo." *Price* was earlier cited herein as authority for the proposition that plaintiff's negligence claim is properly

a maritime issue. Circuit Judge Godbold of the Fifth Circuit stated that plaintiff therein had presented an unsettled issue of whether there was negligence by the ship's crew which contributed to his injury and for which he is entitled to recover under maritime law. In footnotes to his decision Judge Godbold noted decisions that support the view that the ship must have actual knowledge of the dangerous condition. He also noted that the Supreme Court in *Gutierrez v. Waterman Steamship Corp.,* supra, seems to have approved the "known or should have known" approach.

In a later decision, *Manning v. M/V "Sea-Road",* 417 F.2d 603, Chief Judge Brown of the Fifth Circuit found that a longshoreman may recover from a shipowner's violation of the then current Safety Regulations for Longshoremen, saying, " . . . it is plain here that both the specific regulation asserted and the whole statutory-regulatory structure are aimed directly at avoiding personal injuries from hazardous conditions. On accepted principles violation of these safety regulations constitutes negligence per se."

With these principles in mind, it remains to determine here if the absence of a secure scaffold, and any other safety appliances, such as backrails, safety belts, safety lines, or life jackets,[4] was known to the ship's crew, or should have been known. The facts are that LeTourneau failed to provide these safety measures. In lieu of a LeTourneau board scaffold, plaintiff used a board from the vessel, which members of the vessel's crew helped him procure. Plaintiff welded on February 24, 1972. He fell on February 25, 1972. This Court finds that

---

4. # 1915.41 Scaffolds or Staging.
   (a)(5) Scaffolds shall be maintained in a safe and secure condition. Any component of the scaffold which is broken, burned or otherwise defective shall be replaced.
   (i)(1) Backrails and toeboards. Scaffolding, staging, runways, or working platforms which are supported or suspended more than 5 feet above a solid surface, or at any distance above the water, shall be provided with a railing which has a top rail whose upper surface is from 42 to 45 inches above the upper surface of the staging, platform, or

runway and a midrail located halfway between the upper rail and the staging, platform, or runway.
   (i)(3) Rails may be omitted where the structure of the vessel prevents their use. When rails are omitted, employees working more than 5 feet above solid surfaces shall be protected by safety belts and life lines meeting the requirements of # 1915.84(b), and employees working over water shall be protected by buoyant work vests meeting the requirements of # 1915.84(a).

the use by plaintiff of the scaffold, defective in not being secured or accompanied by other safety devices, was known to the crew, or should have been known, particularly in view of the purpose of the OSHA regulations. As said by Judge Brown in Manning: "What could not—the word is *could not*—have occurred without breach of the regulation by the employer surely must meet all the tests anyone has ever contrived—metaphysical or otherwise—on legal causation. . . . And from a substantive point of view Shipowner misconceives the significance of the violation of the regulations. True, violation here is negligence, and negligence for which the employer is not liable because of the exclusive liability provision of the Longshoremen's Act, 33 U.S.C.A. § 905. But what Shipowner overlooks is that the negligent violation of the regulations simultaneously makes the vessel unseaworthy." In footnote 11, Judge Brown called attention to *Provenza v. American Export Lines, Inc.*, 3 Cir., 324 F.2d 660, cert. den. 376 U.S. 952, 84 S.Ct. 970, 11 L.Ed.2d 971 which said: "Nevertheless if the violation of the regulations by the stevedore created a dangerous condition then the law is clear that the shipowner is in turn also liable, even if he did not know of the dangerous situation created by the stevedore, for that is the nature of the owner's duty of seaworthiness."

▉ Normally negligence and lack of seaworthiness are necessarily not comparable, as noted above. Here, however, as the Court has earlier found the Chris Seger not to be in navigation, hence no warranty of seaworthiness owed to plaintiff, the Court nonetheless finds that the shipowner, aware of the type of work being engaged in by plaintiff, was negligent in not having suitable gear aboard and that the crew of the Chris Seger was negligent in furnishing inadequate scaffolding, all of such negligence being equated with unseaworthiness.

▉ This does not mean that the Court does not also find plaintiff guilty of contributory negligence. In *Neal v. Saga Shipping Co.*, S.A., 5 Cir., 407 F.2d 481, it was said:

"A seaman cannot be charged with contributory negligence because he uses an unseaworthy part of a vessel in its defective condition if he has no choice but to use it as it is. . . . But here there was ample opportunity for the decedent to move aside to a safe place after the warning was given." Plaintiff Hendon was an experienced welder at the Vicksburg LeTourneau yard. He had worked on the Chris Seger, as well as other rigs, presumably at considerable heights from the deck or from the ground. He was bound to appreciate the danger of standing on an insecure board scaffolding, at a height of 35 feet over the water, weighed down as he was with heavy gear and clothing. Inasmuch as no other scaffold was available, he should have declined to put himself in a perilous position by trying to hand a billet to a fellow workman or have at least secured his balance before doing so. The Court finds that plaintiff was contributorily negligent to the extent of 50% of the total damages for his injury, which remains to be fixed.

In his fall, plaintiff received an injury to his right knee. He was taken to a Jefferson Parish hospital for x-rays. The attending doctor determined he had suffered bruises only and discharged him to go back to the Chris Seger. During the next day or so, while he remained aboard in bed, his knee and leg swelled to such an extent that he was again taken to a hospital where a doctor drained his knee and put him in a full leg cast. On February 29, 1972, he was returned to Vicksburg for hospitalization, and surgery was performed by an orthopedic surgeon. He tried to return to work at LeTourneau on April 20, 1972 where he was given light duty as a security guard, until he was laid off in April 1973, along with others due to a flood which inundated the shipyard. He returned to regular duty as a welder on June 7, 1973, but was unable to climb the rigs.

Dr. George Samuel Rowlett, Jr., of the Street Clinic, Vicksburg, said his examination of plaintiff on February 29, 1972, revealed a fractured tibia extending into the knee cap. He performed surgery on March

2, 1972, removing damaged cartilage and inserting permanent screws into the knee joint in an open reduction procedure. Plaintiff's knee and leg remained in a full length cast for five weeks. He was thereafter put on crutches, and exercises were prescribed involving no weight bearing. Plaintiff was discharged by the doctor on April 20, 1972, to return for only light duty work, and ultimately for heavy duty work in October 1972, although atrophy was noted. The doctor continued to follow plaintiff, last seeing him in August 1975 for a re-evaluation of his knee strength. The doctor found a good range of motion but said that the cartilage behind the patella had deteriorated, giving plaintiff instability in the knee. He could not recommend that plaintiff do any work requiring him to climb. The doctor assessed his disability as a 20% limitation in the function of the knee and conceded that plaintiff's post-traumatic arthrosis could get worse, which would necessitate future surgery.

Although LeTourneau has underwritten plaintiff's medical expenses, has paid compensation in the sum of $500.00 until plaintiff returned to work in April 1972, and admits that his compensation claim is still open, plaintiff has received no further compensation for his injury. He has meanwhile been intermittently employed at a cafe and to drive trucks. At the time of the trial, he was employed driving a log truck for $35.00 a day, but had received only $1,000.00 during the first eleven months of 1975.

Plaintiff testified that he was paid $3.90 an hour as a welder. His tax records were lost in the same 1973 flood that hit the shipyard. He estimated his annual gross as $11,000.00, which included bonuses for overseas trips on behalf of LeTourneau.

The Court finds that plaintiff is not disabled from gainful employment, but that his ability to work as a welder has been diminished if not destroyed due to his injury. Protracted physical therapy has apparently delayed the onset of immediate deterioration, and for this reason, the Court does not find plaintiff guilty of laches in waiting two years to file his suit. On the basis of his former wages as contrasted to present earnings, and in view of the pain and suffering accompanying his knee disability, the Court finds that total damages should be assessed at $50,000.00 which should be reduced by plaintiff's contributory negligence of 50% to $25,000.00.

The question of any recovery by R & B of the damages assessed herein over and against LeTourneau is not an issue before the Court in these proceedings and the Court therefore makes no ruling as to such.

An order assessing damages to plaintiff against Reading & Bates may be submitted with court costs assessed to the defendant.