Keith A. BOUDREAUX, Plaintiff,

v.

AMERICAN WORKOVER, INC., et al., Defendants,

AWI, INC., Defendant-Third-Party
Plaintiff-Appellant,

v.

AMERICAN INSURANCE CO., Third-Party Defendant-Appellee.

No. 80–3287.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Dec. 7, 1981.
On Rehearing and Rehearing En Banc
Jan. 11, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Wood Brown, III, New Orleans, La., for plaintiff.

Dillon & Cambre, Gerard M. Dillon, New Orleans, La., for defendants.

Before GEE, TATE and WILLIAMS, Circuit Judges.

TATE, Circuit Judge:

We hold that an oilfield specialty worker, injured while performing his employment duties on a vessel (a movable barge) on inland waters, is a "maritime employee" for purposes of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 et seq. ("LHWCA"). We therefore affirm the district court's summary judgment based upon its holding to that effect.

The procedural context in which this central issue of the appeal arises is set forth in an appendix to this opinion. For purposes of this summary judgment determination, the undisputed facts are as follows:

The plaintiff Boudreaux was employed by Aquatek, Inc., as a member of a wireline crew. He was injured on board the defendant AWI's movable (or "semi-submersible") drilling barge, "AWI Rig 6", in inland waters. The injury occurred while he was performing his duties as a rigger, as a member of Aquatek's wireline crew.

The function of the Aquatek crew was to move the wireline equipment to a barge's new location when it was moved, to hook up the equipment with the use of the rig machinery, and to lower a tool to the bottom of the well for some special purpose, such as testing or correcting some deficiency. The crew and equipment were transported by water to and from the drilling barge on which the wirelining work was to be performed. When a particular wirelining task was completed, the wireline crew and equipment departed for the base or for another assignment.

The record indicates that Boudreaux customarily worked on wireline operations 15–17 days out of each 21-day shift, but it does not indicate whether this time was spent on one or on more jobs, nor does it show the approximate amount of time required for a wireline crew to complete any particular wirelining assignment. The record also indicates that Boudreaux's wireline crew performed a substantial part, if not all, of its work in servicing drilling barges in inland waters.

For present purposes, the parties do not dispute that wirelining operations are an integral or essential part of oil and gas exploration and production activities, whether conducted on land or on water. The appellant AWI suggests, however, that wirelining work is a specialty operation performed by a specialized crew both on land and on water drilling rigs, and that a wireline crew member injured in the course of such work should not be considered a "maritime employee" so as to be within the coverage of the LHWCA just because of the happenstance that his work-injury occurs on a movable barge (vessel) when it is on inland waters.[1]

I

The single issue before us is whether Boudreaux, at the time of his injury on navigable inland waters, was engaged in "maritime employment" so as to be within the coverage of the LHWCA. Under the 1972 amendments to that Act, to be entitled to its benefits a disabled employee must (a) be disabled as the result of "an injury occurring upon the navigable waters of the

---

1. If a member of a similar wireline crew was injured while performing his duties on a movable barge offshore on the Outer Continental Shelf, he would be entitled to LHWCA benefits. See Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356, esp. § 1333, which so provides as to employees there injured in operations conducted for the purpose of exploring for, developing, removing or transporting the natural resources of the subsoil and seabed of the Outer Continental Shelf.

United States" (defined as also including adjoining areas), 33 U.S.C. § 903(a)—the "situs" test; and (b) be engaged in "maritime employment" at the time of the injury, 33 U.S.C. § 902(3)—the "status" test.

■ Both the status requirements, as defined by section 902(3), based on the nature of the job, and the situs requirements, as defined by section 903(a), based on geography, must be satisfied before the LHWCA can apply. *P. C. Pfeiffer Co., Inc. v. Ford*, 444 U.S. 69, 73–74, 100 S.Ct. 328, 332–33 (1979); *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 265, 97 S.Ct 2348, 2357, 53 L.Ed.2d 320 (1977).

Prior to 1972 a single situs requirement of the LHWCA governed the scope of its coverage. That requirement limited coverage to workers whose "disability or death result[ed] from an injury occurring upon the navigable waters of the United States (including any dry dock) . . . ." LHWCA of 1927, ch. 509, § 3(a), 44 Stat. 1426. "[T]he Supreme Court decided that a worker who in the course of his duty was obliged to go on navigable waters, however briefly or sporadically, and who suffered an injury while in that historically maritime locality was covered by the [pre-1972] LHWCA. *Calbeck v. Travelers Ins. Co.*, 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 [1962]." *St. Julien v. Diamond M. Drilling*, 403 F.Supp. 1256, 1258 (E.D.La.1973).

In 1972 Congress amended the LHWCA [2] "by replacing the single situs requirement with a two-part situs and status standard." *Pfeiffer, supra*, 444 U.S. at 73–74, 100 S.Ct. at 332–33; *Caputo, supra*, 432 U.S. at 264–65, 97 S.Ct. at 2357. "To be eligible for compensation, a person must be an employee [status] as defined by § 2(3) [33 U.S.C. § 902(3)] who sustains injury on the situs defined by § 3(a) [33 U.S.C. § 903(a)]."

*Pfeiffer, supra*, 444 U.S. at 74, 100 S.Ct. at 333. Situs turns on geography; status on the maritime-connected nature of the job. *Id.*, 444 U.S. at 73–83, 100 S.Ct. at 333–37; *Caputo, supra*, 432 U.S. at 265, 97 S.Ct. at 2358–63. Since it is uncontested that Boudreaux was injured over navigable waters, the controversy here concerns only his "status" as a maritime employee.

After the district court granted summary judgment in this case, another panel of this court rendered a decision in *Pippen v. Shell Oil Company and Inland Well Service, Inc.*, 661 F.2d 378 (5th Cir. 1981). *Pippen* involved a legal issue virtually identical to that now before this panel. In *Pippen*, as here, the injured worker was performing wirelining work that was essential to the function of the vessel (drilling barge) upon which he was working—*i. e.*, offshore mineral production. The wireline employee was injured while working on a drilling barge on navigable inland waters. The issue in *Pippen*, as here, is whether under those circumstances the wireline employee performing temporary specialty work on the drilling barge was engaged in "maritime employment" so as to be covered by the LHWCA.

Significantly to the issue before us, *Pippen* noted:

> Maritime employment is an occupational concept that is dependent upon the nature of the employee's activities. *P. C. Pfeiffer Co. v. Ford*, [444 U.S. 69] 100 S.Ct. 328, 335, 62 L.Ed.2d 225 (1979). In order to determine whether an employee's work is maritime in nature, this Court has held that "we must look to the purpose of the work, not solely to the particular skills used." *Trotti & Thompson v. Crawford*, 631 F.2d 1214, 1221 n. 16

2. On two occasions the Supreme Court has indicated that the "language of the 1972 Amendments is broad and suggests that we should take an expansive view of the extended coverage," *National Northeast Marine Terminal Co. v. Caputo, supra*, 432 U.S. at 268, 97 S.Ct. at 2359, and that the decision (to focus on the nature, not location of employment) "also serves the broader congressional purpose of expanding coverage. Congress intended to apply a simple, uniform standard of coverage." *Pfeiffer v. Ford, supra*, 444 U.S. at 83–84, 100 S.Ct. at 338.

(5th Cir. 1980) (carpenter constructing pier was engaged in maritime employment). The relevant inquiry in determining whether an employee was engaged in maritime employment is whether his activities had a " 'realistically significant relationship to traditional maritime activity.' " *Mississippi Coast Marine, Inc. v. Bosarge*, 637 F.2d 994, 998 (5th Cir. 1981) (carpentry work on wooden thirty-foot pleasure boat resting on blocks was maritime employment) (quoting *Weyerhaeuser Co. v. Gilmore*, 528 F.2d 957, 961 (9th Cir. 1975), *cert. denied*, [429 U.S. 868] 97 S.Ct. 179, 50 L.Ed.2d 148 (1976)). *Fusco v. Perini North River Associates*, 622 F.2d 1111, 1113 (2d Cir. 1980) maritime employment refers to activities that "bear a significant relationship to navigation or to commerce on navigable waters," [construction of sewage plant not connected to traditional maritime activities], *cert. denied* 449 U.S. 1131, 101 S.Ct. 953, 67 L.Ed.2d 119 (1981).

661 F.2d at 382–383.

The test employed by the Second Circuit on remand[3] in *Fusco v. Perini North River Associates*, 622 F.2d 1111 (2d Cir. 1980), was whether the employment bears "a significant relationship to navigation or to commerce on navigable waters." *Id.* at 1113. The production of oil and natural gas from the beds of navigable bodies of water and the ocean bottom has become a maritime activity. This is a major industry with peculiar maritime-related problems. Employment in an industry that provides approximately 40,000 jobs,[4] and untold millions of dollars in revenues and that takes place primarily upon the navigable waters of the United States, bears "a significant relationship to ... commerce on navigable waters."

In *Pippen*, the court found that the wireline employee's work was, as in the present case, necessary to the completion of the offshore drilling process and it concluded that the work performed "had a realistically significant relationship to maritime commerce," so as to be "maritime employment." *Pippen, supra*, 661 F.2d at 384.

■ The ruling in *Pippen* is dispositive of the present issue. In the case before us, Boudreaux (like Pippen) was injured on navigable waters while performing wirelining employment duties that were an integral or essential contribution to the mineral-production function of the vessel upon which he was working. The work performed thus "has a realistically significant connection to traditional maritime activity," *Pippen, supra*, 661 F.2d at 385, so as to be "maritime employment" within the coverage of the LHWCA.

II

The legislative history of the 1972 amendments to the LHWCA re-enforces our view that *Pippen* correctly characterized as "maritime employment," for purposes of the Act, wireline specialty work contributing to the function of a movable drilling barge on inland waters.

The question whether an offshore oil worker injured on a "vessel" is covered by the current LHWCA turns primarily upon whether such a worker is engaged in "maritime employment," 33 U.S.C. § 902(3), a "status" test provided by the 1972 amendments. Unfortunately, the bare language of the statute does not answer this question as nowhere does it provide a definition of "maritime employment". While § 902(3) does mention "longshorem[e]n," "harborworker[s]," etc., the Supreme Court has stated that these references are to be considered only as "example[s] of workers who engage in maritime employment ...." *Pfeiffer, supra*, 444 U.S. at 79, 100 S.Ct. at 335. Examination of the legislative history of the 1972 amendments to the LHWCA

---

3. *Fusco v. Perini North River Associates*, 601 F.2d 659 (2d Cir. 1979), *vacated and remanded*, 444 U.S. 1028, 100 S.Ct. 697, 62 L.Ed.2d 664 (1980), *rev'd on remand*, 622 F.2d 1111 (2d Cir. 1980), *cert. denied*, 449 U.S. 1131, 101 S.Ct. 953, 67 L.Ed.2d 119 (1981).

4. Robertson, Injuries to Marine Petroleum Workers: A Plea for Radical Simplification, 55 Tex.L.Rev. 973 (1977).

and the cases that have construed them are helpful in ascertaining what activities are intended to be included within the term "maritime employment."

Even a cursory reading of the legislative history of the 1972 amendments quickly shows that Congress thought only that it was *extending* the scope of coverage of the LHWCA by enacting the bifurcated test referred to above. *See, e. g.*, Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 92d Cong., 2d Sess., Legislative History of the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972 (Comm. Print 1972) at v (Foreword by Sen. Harrison A. Williams, Jr., Chrmn.); *id.* at 63 (S.Rep.No.92–1125, at 1) (one of the "principle [sic] purpose[s of the bill] is to . . . extend coverage to protect *additional* workers") (emphasis added); *id.* at 64 (S.Rep.No.92–1125, at 2) (the bill "expands the coverage of this Act") (emphasis added). The House report, H.R.Rep. No.1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 4698, is nearly identical to the Senate report both in content and wording, *see, Pfeiffer, supra,* 444 U.S. at 79, n.9, 100 S.Ct. at 335 n. 9; Robertson, Injuries to Marine Petroleum Workers: A Plea for Radical Simplification, 55 Tex.L.Rev. 973, 975 n. 12 (1977). The Senate report does add this, however, in its Section-by-Section Analysis:

Section 2(a) [of the bill] amends section 2(3) of Act to define an "employee" as *any* person engaged in maritime employment. The definition specifically includes any longshoreman or other person engaged in longshoring operations, [etc., but] *does not exclude other employees traditionally covered* . . . .

Comm. Print at 78 (S.Rep.No.92–1125, at 16) (emphasis added).

In light of the repeated statements made throughout the legislative history to the effect that the change in the scope of the coverage of the LHWCA was meant to extend protection to additional workers (*i. e.*, certain maritime workers even though injured on land), the specific statement in the Senate report's section-by-section analy-

sis quoted above, and the fact that offshore oil workers injured upon navigable waters would have been covered prior to the 1972 amendments, *Calbeck, supra; see also Hendon v. Marathon-LeTourneau,* 414 F.Supp. 1282, 1284 (S.D.Miss.1976) (mention of LHWCA benefits paid to off-shore oil worker for pre-1972 injury); *Case v. St. Paul Fire & Marine Ins. Co.,* 324 F.Supp. 352 (E.D.La.1971) (same), *appeal dismissed as moot,* 456 F.2d 252 (5th Cir. 1972), a persuasive argument could be made that any worker who would have been covered under the pre-1972 LHWCA is still covered under the post-1972 LHWCA. Indeed, the Supreme Court has expressly reserved the question whether "Congress excluded people who would have been covered before the 1972 Amendments; that is, workers who are injured on navigable waters as previously defined." *Caputo, supra,* 432 U.S. at 265 n. 25, 97 S.Ct. at 2358 n. 25.

*Pfeiffer, supra,* of course, requires that the "situs" and "status" tests are to be independently satisfied, and holds that "status" is occupational and not geographical in nature. *Pfeiffer, supra,* 444 U.S. at 79, 100 S.Ct. at 335.

However, *Pfeiffer* recognizes that the congressional purpose was to extend coverage. Thus it may be possible to consider that the "status" portion of the test for workers-on-water is satisfied by the fact of their employment on water; but this would distort the statutory language, whatever Congress' intent, if the worker's presence on the water is fortuitous and otherwise unconnected with maritime employment. Moreover, at least three cases decided by the courts of appeals, including one by the Fifth Circuit, refuse to consider the mere fact of injury while working on water sufficient for coverage. See *Fusco v. Perini North River Associates,* 601 F.2d 659 (2d Cir. 1979), *vacated and remanded,* 444 U.S. 1028, 100 S.Ct. 697, 62 L.Ed.2d 664 (1980), *rev'd on remand,* 622 F.2d 1111 (2d Cir. 1980), *cert. denied,* 449 U.S. 1131, 101 S.Ct. 953, 67 L.Ed.2d 119 (1981) (worker injured over navigable waters while engaged in constructing sewage disposal project ex-

tending over water not engaged in "maritime employment" and thus not covered by LHWCA); *Thibodaux v. Atlantic Richfield Co.*, 580 F.2d 841 (5th Cir. 1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979) (worker who drowned when overloaded crewboat sank was not engaged in "maritime employment," and thus not covered by LHWCA; he was merely being transported to his job site by water, notwithstanding that on the occasion in question the vessel was to stop and place a pollution pan on a sunken barge used as a dock); *Weyerhaeuser Co. v. Gilmore*, 528 F.2d 957 (9th Cir. 1975), *cert. denied*, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976) ("pondman" injured while working at his duties involving the sorting of logs while moving about on walkways and logs that were floating on navigable waters was not engaged in "maritime employment" and thus not covered by LHWCA).

These decisions concern, however, situations where the employee was injured or killed in an employment activity with peripheral relationship to maritime activity, although the accident occurred on water. The employment activities there concerned, distinguishably from that of Pippen and the present Boudreaux, did not involve the performance of work that was an integral or essential contribution to the function of a vessel upon which the injury occurred.

Moreover, to focus simply upon the task of the employee upon the barge after he got there is too narrow a test. What is important is not the worker's task alone but the industry of which it forms a part. (The harborworker-welder, admittedly covered by the LHWCA, is after all but a welder; his job is indistinguishable from welding on land. The same could be said of the ultimate task of most harborworkers.)

Here Boudreaux was employed in an activity that was an integral or essential contribution to the production of oil and natural gas from the beds of navigable bodies of water and the ocean bottom. Mineral exploration and development on offshore locations has become recognized in maritime jurisprudence as a maritime activity. See *Pippen* and decisions cited therein; *see also*, Robertson, *supra*, 55 Tex.L.Rev. 973. Congress has recognized the maritime nature of this employment by, for instance, extending the LHWCA to cover oil-production activities on the Outer Continental Shelf. (See note 1.) The test of whether the employment is "maritime" for purposes of the LHWCA, as noted in part I of the text, is whether the employment activities bear a significant relationship to commerce on navigable waters. Employment in an industry which provides approximately 40,000 jobs, *see* Robertson, *supra*, 55 Tex.L.Rev. at 973, and untold millions of dollars in revenues and takes place primarily upon the navigable waters of the United States, we think, must indeed bear a significant relationship to commerce on the navigable waters, particularly when that employment is itself on a vessel, albeit temporarily.

In *Caputo, supra*, the Supreme Court, faced with a similarly difficult question of statutory interpretation of the 1972 amendments to the LHWCA, nevertheless felt not without guidance:

> The language of the 1972 Amendments is broad and suggests that we should take an expansive view of the extended coverage. Indeed, such a construction is appropriate for this remedial legislation. The Act "must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." *Voris v. Eikel*, 346 U.S. 328, 333, 74 S.Ct. 88, 92, 98 L.Ed. 5 (1953).

*Caputo, supra*, 432 U.S. at 268, 97 S.Ct. at 2359. Two years later, in finding two dockside workers who were only marginally related to the loading and unloading of ships, covered by the LHWCA, the Court recalled its statements in *Caputo* regarding the liberal construction that should be accorded remedial acts and added, "our decision today also serves the broader congressional purpose of expanding coverage." *Pfeiffer, supra*, 444 U.S. at 77, 83, 100 S.Ct. at 334, 338. Cf. 33 U.S.C. § 920(a) (1976 ed.) ("In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary, that the claim comes within the provisions of this chapter.").

We conclude, therefore that "maritime employment" within the legislative intent of the 1972 amendments to the LHWCA clearly includes a specialty worker injured on a drilling rig in inland waters. Further, from a policy standpoint, the legislatively intended uniformity of treatment of maritime and amphibious workers, regardless of situs, would be enhanced if that Act is held applicable to non-seamen specialty workers who are injured on vessels situated in state territorial waters. Otherwise, differing remedies would be provided to workmen injured in the performance of the identical offshore mineral-production employment—remedies would differ, depending on whether the injury occurred in state waters or on the Outer Continental Shelf, and could differ from state to state, depending upon in which state's territorial waters the injury occurred.

### Conclusion

Boudreaux was injured while working on navigable waters and while engaged in "maritime employment" within the meaning of the LHWCA. The district court correctly held that, under the factual showing made for purposes of the summary judgment motion, Boudreaux was a "maritime employee". Consequently, we AFFIRM the judgment of the district court.

AFFIRMED.

### APPENDIX

The issue arises in the following context:

The plaintiff Boudreaux brings this maritime tort suit against AWI, Inc., the owner and operator of the vessel (drilling barge) upon which he was injured. Boudreaux alleges that he was employed by Aquatek, Inc. as a rigger on a wireline crew working aboard the vessel and that he was injured through the negligence of AWI while performing wirelining operations in the course and scope of his employment. AWI subsequently filed a third-party demand against Aquatek (the plaintiff Boudreaux's employer) and its insurer ("American"). AWI alleged that Aquatek's fault was a direct cause of the accident, and it prayed for indemnifying or contributing judgment against these third-party defendants in the event the plaintiff Boudreaux was allowed recovery against AWI.

American, Aquatek's insurer, filed a motion for summary judgment. (It is conceded that, with regard to the issue before us, this insurer asserts the statutory defense of its insured, the employer Aquatek.) The ground upon which this motion was sustained is the statutory immunity of Aquatek, the employer, from any liability to its "maritime employee" within the coverage of the LHWCA, other than the exclusive remedy provided by that Act. 33 U.S.C. § 905.

Thus, if Boudreaux at the time of the injury was a "maritime" employee provided a remedy by the LHWCA, then his employer Aquatek cannot be held liable to the defendant AWI to indemnify it for, or to contribute to the payment of, any damages awarded to Boudreaux against AWI for injuries sustained in the course of his "maritime" employment. The district court so held, in granting the employer's insurer summary judgment dismissing AWI's third-party demand against it. By virtue of a Rule 54(b) order determining there was no just reason for delay and directing entry of judgment, the dismissal is an appealable judgment.

GEE, Circuit Judge, dissenting:

I, of course, agree that we are presently bound by the very recent panel decision, handed down on November 13, 1981, in *Pippen v. Shell Oil Co.*, 661 F.2d 378 (5th Cir. 1981). Neither it nor the present majority opinion is necessarily final as yet, however—opportunities for rehearing being present—and since I find myself in respectful disagreement with both decisions, I write to say why.

The fact situations in both cases are essentially identical: an oilfield worker injured while doing a landside job from a drilling barge located on navigable inland waters. The dispositive legal issue in each case is likewise the same: was the injured worker a "maritime employee" covered by the LHWCA? Both panel majorities answer that he was. In each instance, the basic course of reasoning is the same: that the 1972 amendments to LHWCA were intended generally to broaden and in no respect to narrow its coverage; that his work was essential to the mission of the vessel on which he was injured; and that drilling for and producing oil and gas from the inland seas has become—in and of itself—a part of maritime commerce or navigation, so that all persons working in connection with it are maritime employees.

For various reasons, all of these propositions seem to me dubious: the first is simply incorrect, as the *Pippen* majority tenta-

tively acknowledges in a footnote;[1] the second is an argument not for, but against, LHWCA coverage; and the third constitutes a giant legislative step, appropriate for the Congress but scarcely, in my view, for an intermediate appellate court. As to this last, there is little that I can say, since my difference with the majority apparently goes to our differing basic conceptions of the judicial function. If it were appropriate for us, and within our assigned powers, to extend LHWCA coverage to an entire industry because we think that extension wise or just, then my debate with my brothers in the majority would be one about prudence and economic policy. Since, however, I think formation of such major policy more appropriate to the Congress than to nonelective judges, I decline to embark on such a contest. The Supreme Court has consistently deferred to the expertise and wisdom of Congress in this area. In *Nacirema Operating Co. v. Johnson,* 396 U.S. 212, 224, 90 S.Ct. 347, 354, 24 L.Ed.2d 371 (1969), the Court declared that "[t]he invitation to move [the *Jensen*] line must be addressed to Congress, not to this Court." The Court reiterated this principle in *P. C.*

*Pfeiffer Co. v. Ford,* 444 U.S. 69, 73, 100 S.Ct. 328, 332, 62 L.Ed.2d 225 (1979). When the Congress wished to effect the last such massive extension of LHWCA coverage, one to the Outer Continental Shelf, it knew how to do so.[2] Following *Pippen,* we do so ourselves today in a comparable area, without benefit of legislative process—no committee hearings, no balancing of risks and economic considerations, no open debate, and no submission to the executive for signature or veto—on the basis of a chain of deductive reasoning. I would not do so.

*Contrary to the majority opinion, the 1972 amendments do not solely or indiscriminately broaden coverage.*

A major purpose of the 1972 amendments to what is, after all, styled the "Longshoremen's and Harbor Workers' Compensation Act"[3] was to extend *situs* coverage to areas adjoining navigable waters.[4] As the Supreme Court noted in *Pfeiffer,* 444 U.S. at 72, 100 S.Ct. at 332, 62 L.Ed.2d at 230, Congress in the original LHWCA provided compensation benefits seaward of the water's edge, the limit for state compensation systems under *Southern Pacific Co. v.*

---

1. 661 F.2d at 383 n.7.

2. See the Outer Continental Shelf Lands Act, which extends LHWCA coverage to employees injured as a result of exploration and development of natural resources *on and underlying* the seabed of the Outer Continental Shelf, 43 U.S.C. § 1333(b) (Supp. III 1979), but carefully omits any extension of sovereignty to the waters there or even to wrecks lying on the seabed. *Treasure Salvors v. Unidentified Wrecked, Etc.,* 569 F.2d 330, 339 (5th Cir. 1978).

3. 33 U.S.C. § 901 (1976).

4. EXTENSION OF COVERAGE TO SHORESIDE AREAS

   The present Act, insofar as longshoremen and ship builders and repairmen are concerned, covers only injuries which occur "upon the navigable waters of the United States." Thus, coverage of the present Act stops at the water's edge; injuries occurring on land are covered by State Workmen's Compensation laws. The result is a disparity in benefits payable for death or disability for the same type of injury depending on which side of the water's edge and in which State the accident occurs.

   . . . .

   It is apparent that if the Federal benefit structure embodied in Committee bill is enacted, there would be a substantial disparity in benefits payable to a permanently disabled longshoreman, depending on which side of the water's edge the accident occurred, if State laws are permitted to continue to apply to injuries occurring on land. It is also to be noted that with the advent of modern cargo-handling techniques, such as containerization and the use of LASH-type vessels, more of the longshoreman's work is performed on land than heretofore.

   The Committee believes that the compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water. Accordingly, the bill would amend the Act to provide *coverage of longshoremen, harbor workers, ship repairmen, ship builders, shipbreakers, and other employees engaged in maritime employment (excluding masters and members of the crew of a vessel) if the injury occurred either upon the navigable waters of the United States or any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other area adjoining such navigable waters customarily used by an em-*

*Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917). That Act provided only a situs test for coverage, "the navigable waters of the United States (including any dry dock)," [5] and defined employees solely by exclusion, omitting from their numbers members of vessel crews, persons servicing vessels of under eighteen tons, and various government employees.[6] Thus, anyone injured on navigable waters of the United States, with these exceptions, was covered.

When the time came, in the 1972 amendments, to extend coverage landward across the *Jensen* line to areas "customarily used by an employer in loading, unloading, repairing or building a vessel," [7] Congress apparently felt the need—doubtless in view of the types of individuals whose occupations were essentially unrelated to maritime employment who might be found in the new areas covered—to provide a status test as well as a situs one for coverage. This it did by retaining the earlier exclusions for seamen and others and adding the requirement that to be covered one must when injured be an employee "engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, . . . ." 33 U.S.C. § 902(3) (1976).

It is thus apparent, and the Supreme Court has held, that the amendment, while adding new areas to the situs requirements for coverage and thus to this extent expanding it, "restricts the scope of coverage by further requiring that the injured worker must have been engaged in 'maritime employment.'" *P. C. Pfeiffer Co.,* 444 U.S. at 78, 100 S.Ct. at 335, 62 L.Ed.2d 233. It is thus inaccurate to describe the 1972 LHWCA amendments as intended simply to "expand coverage." The accurate assessment is that the amendments aimed to *change* coverage, expanding the situs to which the Act applies by moving the coverage cut-off somewhat landward across the *Jensen* line, while at the same time restricting the class of employees covered within the now expanded situs area. Nor did the Congress leave in doubt that it intended precisely this. In identical passages, both the Senate and the House Reports on the 1972 amendments declare:

> The Committee *does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel,* just because they are injured in an area adjoining navigable waters used for such activity.[8]

We have, in a panel opinion not referred to by the majority, construed and acknowledged these status restrictions as limiting coverage to such persons who are "directly involved" in the activities specified in the committee reports, or perhaps to others suf-

---

ployee in loading, unloading, repairing, or building a vessel.
H.R.Rep.No.1441, 92d Cong., 2d Sess. 11, *reprinted in* [1972] U.S.Code Cong. & Ad.News 4698, 4707–08 (emphasis added).

**5.** § 3(a), 44 Stat. 1426 (1927).

**6.** § 3(b), 44 Stat. 1426 (1927). Seamen preferred to retain their remedies under the Jones Act and maritime law. *See Nogueira v. New York, N.H. & H.R.R.,* 281 U.S. 128, 136, 50 S.Ct. 303, 305, 74 L.Ed. 754 (1930).

**7.** 33 U.S.C. § 903(a) (1976).

**8.** H.R.Rep.No.1441, 92d Cong., 2d Sess. 11, *reprinted in* [1972] U.S.Code Cong. & Ad.News 4698, 4708; S.Rep.No.1125, 92d Cong., 2d Sess. 13 (emphasis added).
The contention, suggested by the Reports' "just because" clause, that the restriction of coverage to stevedores, ship repairmen and similar workers might apply only to the newly-added "adjoining areas" is untenable in view of the Supreme Court's rejection of its mirror image in *Pfeiffer*: "We decline the invitation to construe 'maritime employment' so as to create two differing situs requirements in a single sentence." *P. C. Pfeiffer Co.,* 444 U.S. at 79, 100 S.Ct. at 335, 62 L.Ed.2d at 234.
I also note that Congress in 1971 considered but did not enact S. 1547 and H.R. 11071, companion bills styled the "Marine Petroleum Workers' Compensation Act of 1971," which would have extended LHWCA coverage to all "marine extractive operations." S. 1547, 92d Cong., 1st Sess. (1971); H.R. 11071, 92d Cong., 1st Sess. (1971). These bills were introduced during consideration of several bills to amend LHWCA in 1971, some of which were subsequently enacted as the 1972 amendments.
S. 1547, popularly called the "Tower bill," was intended to overrule decisions that had extended Jones Act coverage to workers on movable drilling barges, *e. g., Offshore Co. v. Robison,* 266 F.2d 769 (5th Cir. 1959). Intro-

ficiently similar to these to be brigaded with them:

> In its reports, Congress has also indicated the extent to which coverage should be granted to persons who are not them-selves loading, unloading, repairing, building, or breaking a vessel but who are nevertheless performing closely related functions. Thus, the House Report states that a checker would be performing cov-ered work if he was "*directly involved* in the loading or unloading functions . . .".[17] Our holding is that *an injured worker is a covered "employee" if at the time of his injury (a) he was performing the work of loading, unloading, repairing, building, or breaking a vessel, or (b) although he was not actually carrying out these specified functions, he was "directly involved" in such work.*[18]

---

[17] [H.R. 92–1441, 1972 Code Cong. & Ad. News at 4708]. (Emphasis supplied.) The same report also stated that clerical employees who do not "participate in the loading or un-loading of cargo" would not be covered by the new Act. *Id.*

[18] *See* Gorman, *The Longshoremen's and Harbor Workers' Compensation Act—After the 1972 Amendments,* 6 Journal of Maritime Law and Commerce 1, 10 (1974). By this holding, we do not mean to suggest that future cases may not bring to light other types of covered work which cannot be characterized as loading, unloading, repairing, building, or breaking, and which are not "directly in-volved" with these five types of work, but which nevertheless are *sufficiently similar* to fall within the Congressional scheme. No such additional category of covered work appears in the cases before us, but we will not foreclose the possibility of such categories arising in future litigation.

*Jacksonville Shipyards, Inc. v. Perdue,* 539 F.2d 533, 539–40 (5th Cir. 1976), *vacated and remanded,* 433 U.S. 904, 97 S.Ct. 2967, 53 L.Ed.2d 1088 (1977), *reaff'd as to reasoning,* 575 F.2d 79 (5th Cir. 1978), *aff'd sub nom. P. C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979) (empha-sis added). *See also Sohyde Drill. & Marine v. Coastal States Gas Prod.,* 644 F.2d 1132 (5th Cir. 1981), *petition for cert. filed sub. nom. Valero Energy Corp. v. Sohyde Drill-ing & Workover, Inc.,* 50 U.S.L.W. 3045 (U.S. Aug. 18, 1981) (No. 81–222), (oil well workover not marine activity).

It seems to me that in ignoring the ex-press language of both houses of Congress

---

ductory Statement of Senator John Tower on S. 1547, Marine Petroleum Workers' Compensa-tion Act of 1971, 117 Cong.Rec. 10,490–91 (1971). Senator Tower had introduced this bill in a previous term of Congress as well. *Id.*

Senate testimony on S. 1547 reveals that it was strongly supported by an industry group which claimed that its member companies vol-untarily provided benefits under the Act to em-ployees injured while engaged in marine ex-tractive operations. However, S. 1547 was op-posed in testimony on behalf of the class of workers involved. The workers' representa-tives claimed that making compensation under LHWCA the sole and exclusive remedy for in-jured workers of this class would diminish the work injury protection currently available un-der the Jones Act, the Death on the High Seas Act, or state law. *Hearings Before the Sub-committee on Labor of the Senate Committee on Labor and Public Welfare on S. 2318, S. 525, and S. 1547,* 92d Cong., 2d Sess. 60, 256–58, 393–411, 511–59, 574–614. So, just as seamen preferred to to retain their Jones Act and other maritime law remedies at the time the 1927 LHWCA was enacted, *see* note 6 *supra,* it ap-pears that oil workers argued against inclusion under the 1972 LHWCA amendments.

*Robison* seamen serving beyond the three-mile limit were again threatened with a change in coverage in 1976 under a proposed amend-ment to the Outer Continental Shelf Lands Act. H.R. 6218, 94th Cong., 2d Sess. (1976). How-ever, H.R. 6218's threatened change was re-moved in conference and the resulting legisla-tion died on Congress' adjournment. H.R.Rep. No.1632, 94th Cong., 2d Sess. 8 (1976).

There have also been numerous other bills introduced to amend LHWCA since 1972, as well as hearings analyzing the impact of the 1972 amendments. *See, e. g.,* [1979–80] Cong. Index (CCH) 28,544 (H.R. 7610, 96th Cong.), 28,568 (H.R. 8091, 96th Cong.); [1977–78] Cong. Index (CCH) 28,926 (H.R. 13593, 95th Cong.), 28,970 (H.R. 14387, 95th Cong.); [1973–74] Cong. Index (CCH) 3577 (H.R. 1490, 93d Cong.); *Oversight Hearings Before the Subcomm. on Compensation, Health, and Safe-ty of the House Comm. on Educ. and Labor,* 95th Cong., 2d Sess. 271–92 (1978) (industry testimony and proposed amendment on drilling contractors' and oil companies' liability for off-shore operations).

Despite all of this activity from 1971 until the present and despite its obvious awareness of the issue, Congress has not seen fit to do what *Pippen* and the majority do today—riding to the rescue of workers who wish to be left where they are.

and an opinion by our own court, all limiting, with one voice, the meaning of the term "maritime employment" as used in the statutory definition to "loading, unloading, repairing, or building a vessel" and activities *ejusdem generis*[9] with these—such as shipbreaking—and, in defiance of these authoritative and binding statements, extending the term to cover an industry entirely different from shipping and to an entire class of oilfield workers having nothing whatever to do with shipping and its supporting activities, the majority here and the panel in *Pippen* have acted with extraordinary freedom. Their novel departure places them, at least in principle, in a position of conflict with every other circuit that I am aware has considered the matter—the Second, the Fourth, and the Ninth, all major maritime circuits—and with the Supreme Court as well.[10]

*The Supreme Court and our sister circuits.*

The first decision within our circuit to consider the effect of the 1972 amendments on coverage was that of the district court in *St. Julien v. Diamond M Drilling Co.,* 403 F.Supp. 1256 (E.D.La.1975), which extended LHWCA coverage to a specialty oil worker on a drilling barge on the basis of just such a notion of universally expanded coverage. There, commenting on the 1972 amendments to LHWCA coverage, the district court observed:

> The purpose of the 1972 LHWCA amendments was to expand coverage; there is no evidence of a congressional intent to restrict coverage previously afforded. See Report of the Senate Subcommittee on Labor of the Committee on Labor and Public Welfare, 92d Cong., 2d

Sess., (1972), p. 12; Report of the House Committee on Education and Labor, 92d Cong., 2d Sess. (1972), p. 10; see also Watson, Broadened Coverage under the LHWCA, 33 La.Law Rev. 683, 694 (1973). The Act now defines coverage as extending to "employees engaged in maritime employment." Now, as before the amendments, "workers who are not seamen but who nonetheless suffer injury on navigable waters are no doubt (or so the courts have been willing to assume) engaged in 'maritime employment.' " Gilmore and Black, The Law of Admiralty, 2d ed. 1974, p. 428. As those authors state:

> The courts wisely decided, long ago, that for the purpose of the Jones Act and the maritime law remedies, they would not distinguish between the deck hands and the waiters, bartenders, stewards, maids and hairdressers; going to sea was a sufficient participation in the risk to entitle the injured worker to his (or her) remedy. In the same way, the fact of waterfront employment should be taken to be a sufficient participation in the risk for the purpose of entitling the injured worker to claim LHCA benefits. Id. at p. 430.

*Id.* at 1258 (emphasis added).

These conclusions, resting in part on the notion of generally expanded coverage—and no restriction of existing coverage—under the amendments and in part on analogy to Jones Act authority, take no account whatever of the newly enacted status requirement. Some five years later, however, the Supreme Court expressed the unani-

---

**9.** *Cf. Walter Tantzen, Inc. v. Shaughnessy,* 624 F.2d 5, 7 (2d Cir. 1980) ("maritime employment" defined *ejusdem generis* to occupations listed in § 902(3)).

**10.** The views of the majority and of *Pippen* also conflict with the current interpretation of LHWCA expressed in the opinions of the Benefits Review Board (BRB), the administrative body charged with applying the Act and to which, we recently held, we must give substantial deference. *See Mississippi Coast Marine, Inc. v. Bosarge,* 637 F.2d 994, 999 (5th Cir. 1981).

In 1977, the BRB held an oil roustabout on a fixed oil well platform in the navigable waters of the Mississippi River delta not engaged in maritime employment. *Anderson v. McBroom Rig Bldg. Serv., Inc.,* 5 Ben.Rev.Bd.Serv. (MB) 713 (1977). *Anderson* controls subsequent oil worker coverage cases before the Board. *See, e. g., Broussard v. Waukesha Pearl Indus.,* 13 Ben.Rev.Bd.Serv. (MB) 37 (1981); *Cunningham v. SWECO, Inc.,* 11 Ben.Rev.Bd.Serv. (MB) 792 (1980).

mous view that, unlike the Jones Act, the amended Longshoremen's Act does not extend coverage to all workers at a maritime situs. *P. C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979). True, situs is a requirement, though one greatly broadened by the 1972 amendments to abolish "walking in and out of coverage" at the *Jensen* line.[11]

But, the Court declared, there is another requirement, status:

> The discussion of coverage in the legislative history also shows that Congress intended the term "maritime employment" to refer to status rather than situs. Committees in both Houses of Congress recognized:
>
> > "[T]o take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. *The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel,* just because they are injured in an area adjoining navigable waters used for such activity. Thus, employees whose responsibility is only to pick up stored cargo for further trans-shipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo."
>
> This legislative history discusses workers solely in terms of what they are doing and never in terms of where they are working.

*Id.* at 79–80, 100 S.Ct. at 335–36, 62 L.Ed.2d at 234 (footnotes omitted, emphasis added). Elaborating, the Court continued:

> We believe that § 2(3)'s explicit use of the terms "longshoreman" and "other person engaged in longshoring opera-

tions" to describe persons engaged in maritime employment *demonstrates that workers doing tasks traditionally performed by longshoremen are within the purview of the 1972 Act. . . .* [T]he crucial factor is the nature of the activity to which a worker may be assigned. . . .

> Our decision serves the intent of Congress in creating the status requirement. First, it focuses upon the nature, not the location, of employment. Second, *it does not extend coverage to all workers in the situs area.* There is no doubt for example, that neither the driver of the truck carrying cotton to Galveston nor the locomotive engineer transporting military vehicles from Beaumont was engaged in maritime employment even though he was working on the marine situs.

*Id.* at 82–83, 100 S.Ct. at 336–37, 62 L.Ed.2d at 236–37 (emphasis added). With *Pfeiffer,* then, it became plain that *St. Julien* was wrongly decided and that determining coverage under LHWCA required both a situs and a status test. Two of our more recent authorities recognizing the dual nature of the requirement are *Hullinghorst Industries, Inc. v. Carroll,* 650 F.2d 750 (5th Cir. 1981), and *Trotti & Thompson v. Crawford,* 631 F.2d 1214 (5th Cir. 1980), both of which concern carpenters working on the construction of maritime facilities—piers—at that maritime situs. And the *Pippen* opinion itself, cited and relied on extensively by today's majority, recognizes that *St. Julien's* reliance on the concept of a simple expansion of coverage, with no added status restrictions, was no longer viable after *Pfeiffer.* Speaking of *St. Julien, Pippen* observes:

> There, the employee was a stabber whose job was to assist in running casing (pipe) into oil and gas wells. At the time of his death, he was working offshore on a submersible drilling rig. The court found that the LHWCA applied to the action. It noted that there was no evidence that the 1972 amendments to the LHWCA, which replaced the original situs test with a dual situs and status test, were intend-

---

**11.** See our discussion in *Trotti & Thompson v.*

*Crawford,* 631 F.2d 1214, 1217 (5th Cir. 1980).

ed to restrict the prior coverage of workers injured on navigable waters. *Id.* at 1258. Thus, according to the *St. Julien* court, any worker who would have been covered prior to the 1972 amendments (because he satisfied the situs test) would also be covered after the 1972 amendments; workers who were injured on navigable waters would be assumed to be engaged in maritime employment. *The Supreme Court's holding in Pfeiffer has apparently disaffirmed that analysis. In Pfeiffer, the Supreme Court rejected the contention that the term maritime employment, as used in the § 902(3) status test, incorporates a geographic limitation.* Rather, the Court held that maritime employment "embod[ies] an occupational rather than a geographic concept," and "refers to the nature of a worker's activities." 444 U.S. at 79, 100 S.Ct. at 335, 62 L.Ed.2d at 234.

*Pippen v. Shell Oil Co.*, 661 F.2d 378 at 383 n.7 (5th Cir. 1981) (emphasis added).

This case and *Pippen* present us with a situation further removed, one in which a worker at a situs indisputably maritime was injured at a task having no maritime connection whatever except its situs. Working over an oil well is an occupation that has no significant relationship to loading or unloading vessels, to harbor work, to navigation, or to commerce on navigable waters. It is a landside job, and one in no sense of a kind with "loading, unloading, repairing, or building a vessel." If such an activity accords LHWCA status, then any landside job will do so if performed at a maritime situs; and Congress' carefully added status requirement is by us repealed. *Pfeiffer* teaches, however, that such is not the case, that there *is* a status test, and that satisfying the situs test does not in and of itself satisfy the status one.

And, if more be needed, it is apparent in the course of decision evidenced by the recent *Fusco* opinions.[12] Messrs. Fusco and Sullivan were construction laborers building a sewage disposal plant upon navigable waters adjoining New York City. The Benefits Review Board, reversing the decision of an administrative law judge as to Mr. Fusco and affirming that of another as to Mr. Sullivan, held that since both were engaged in a construction project that had no realistically significant relationship to navigation or commerce over navigable waters, neither was engaged in maritime employment, and neither met the "status" test.

Fusco and Sullivan appealed to the Second Circuit, which found each of them covered by the Act and hence reversed the board. 601 F.2d 659 (2d Cir. 1979). Writing pre-*Pfeiffer*, that court reached a conclusion similar to that of our district court in *St. Julien*:

Weighing all relevant factors, we interpret the critical phrase "person engaged in maritime employment" geographically *so as to include any person whose principal duties are performed on navigable waters as that term was understood before 1972.* In this case we have no occasion to decide whether the critical phrase also includes a person whose principal duties are on land but who suffers work-related injuries while performing duties upon navigable waters.

*Our conclusion is consistent with the purposes of the Congress—to extend and not to withdraw eligibility*—and avoids the harsh results which would flow from a strictly occupational interpretation.

Since each claimant—that is Fusco and Sullivan—performed his principal duties upon navigable waters as that term was defined in § 3(a) of the original 1927 LHWCA, 44 Stat. 1426, 33 U.S.C. § 903(a), and sustained on such waters a work-related injury, we hold that each was eligible for compensation as "[a] person engaged in maritime employment" within the meaning of § 2(3) of the LHWCA as amended in 1972, 86 Stat. 1251, 33 U.S.C. § 902(3) (1970 ed., Supp. V).

---

12. *Fusco v. Perini North River Associates*, 601 F.2d 659 (2d Cir. 1979), *vacated and remanded*, 444 U.S. 1028, 100 S.Ct. 697, 62 L.Ed.2d 664 (1980), *rev'd on remand*, 622 F.2d 1111 (2d Cir. 1980), *cert. denied*, 449 U.S. 1131, 101 S.Ct. 953, 67 L.Ed.2d 119 (1981).

*Id.* at 669 (footnote omitted, emphasis added).

On petition for writ of certiorari, the Supreme Court vacated that judgment and remanded to the circuit court for reconsideration in light of its intervening *Pfeiffer* decision. 444 U.S. 1028, 100 S.Ct. 697, 62 L.Ed.2d 664 (1980).

The circuit court reconsidered its former decision and held it erroneous:

> In our original opinion, without considering whether either claimant was a harborworker, we concluded that each claimant was a "person engaged in maritime employment" because the term "maritime employment" was to be interpreted geographically as including anyone "whose principal duties are performed on navigable waters." We, therefore, held that each claimant was entitled to compensation.
>
> The conclusion upon which our earlier opinion rested has been rendered untenable by the holdings in *P. C. Pfeiffer v. Ford, supra,* (hereinafter called the *Ford* case) that, as used in § 2(3) of the LHWCA, "the term 'maritime employment' refers to the nature of a worker's activities," 444 U.S. at 79, 100 S.Ct. at 335, 62 L.Ed.2d at 234, and that it is "an occupational rather than a geographic concept." *Ibid.*
>
> While the *Ford* case does not deal with construction workers and the opinion does not address itself to the question whether the 1972 amendments had the effect of depriving any class of workers of benefits which it would have enjoyed under the pre-1972 law, we read the opinion as precluding any application of the LHWCA, as amended in 1972, to an employee whose activities do not bear a significant relationship to navigation or to commerce on navigable waters.
>
> . . . .
>
> In the cases at bar the claimants' activities had nothing significant to do with navigation or with commerce on navigable waters. They were engaged exclusively in constructing a sewage disposal plant. It is not significant that the plant was being constructed so that sewage would not cause pollution of navigable waters; nor that the claimants performed part or all of their work while upon floating stages or upon barges. The only sense in which the claimants' activities were maritime was in the sense of their locus. To base a decision upon the locus of work is to found it upon a geographic concept—a foundation precluded by the reasoning in the *Ford* case.
>
> Parallel reasoning leads us to hold that the claimants were not within the meaning of § 2(3) "harborworkers." As there used, the term "harborworker" does not refer to the place where the employee works but to the activity he performs. *To come within § 2(3) a harborworker's activity must relate to ships, as is shown by the test of § 2(3) which refers to a "harborworker including a ship repairman, shipbuilder, and shipbreaker."*

622 F.2d at 1112–13 (citation omitted, emphasis added). So reasoning, the court denied the petition of Fusco and Sullivan and affirmed the order of the Benefits Review Board.[13]

On renewed petition for writ of certiorari, this time by Fusco and Sullivan, the writ was denied, 449 U.S. 1131, 101 S.Ct. 953, 67 L.Ed.2d 119 (1981). I am aware that, as we are frequently cautioned by the Court, in the normal case little is to be attributed to denials of the writ of certiorari. Nevertheless, in such circumstances as these, it is difficult to avoid the conclusion that the result in *Fusco I* was unacceptable to the Supreme Court, while that in *Fusco II* was thought correct.

Thus *Fusco II* represents the position of the Second Circuit and probably that of the Supreme Court as well: being engaged in maritime employment is a prerequisite to being covered by LHWCA, and whether or not employment is maritime is to be gauged by reference to the specific instances set forth in the Section 2(3) definition, the ref-

---

**13.** Our footnote reference in *Trotti* to the result in *Fusco II,* while correct as to the disposition of the Director's petition, is erroneous as to Fusco's and Sullivan's. 631 F.2d at 1220 n.14.

erence to "any longshoreman or other persons engaged in longshoring operations, any harborworker including a ship repairman, shipbuilder, and shipbreaker." 622 F.2d at 1113. The position of the Ninth Circuit, in turn, is illustrated by a decision cited and relied on by the Second at the reference noted just above in *Fusco II.*

In that case, *Weyerhauser Co. v. Gilmore,* 528 F.2d 957 (9th Cir.), *cert. denied,* 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976), the Ninth Circuit addressed a claim to LHWCA benefits made by Mr. Robert Gilmore, a sawmill employee who was injured when he fell from a floating walkway over Coos Bay, a saltwater inlet of the Pacific Ocean. Like the district court in *St. Julien,* the Benefits Review Board had adopted a "general expansion of coverage, without restriction" approach to the 1972 amendments:

> "*[A]nyone* covered under the Act prior to the 1972 amendments must indeed be permitted to come within its protection subsequent to the amendments.
>
> "The fact that claimant is called a pondman or millworker is irrelevant as to determining his qualifications as an employee within the terms of the Act. Therefore, the Board finds that Claimant's injury in the course of his employment was within the coverage of the Longshoremen's and Harborworkers' Compensation Act, as amended, and he is entitled to benefits."

*Id.* at 959 (emphasis added). The Ninth Circuit rejected this approach and reversed the Board's decision. In so doing, it held that, for status coverage, an employee's work must bear a realistic relationship to "*the traditional work and duties of a ship's service employment,*" to " '*traditional maritime activity* involving navigation and commerce on navigable waters.' " *Id.* at 961 (emphasis added). The language of the opinion is both correct and apposite here, and it merits direct quotation:

> The Board's erroneous conclusion that Claimant is entitled to LHCA benefits stems from a misinterpretation of the frequently stated "expansion" of cover-

age by the 1972 amendments. This expansion refers only to the broadened definition of "navigable waters," (maritime jurisdictional requirement) which now includes "adjoining" piers and other areas prescribed in § 903(a). In expanding the maritime situs element of the Act, however, Congress clearly did not intend to broaden the class of covered employees to include *anyone* injured in an adjoining area. This intent is manifest in the legislative history. In debate before the House, Representative William Steiger stated:

"[T]he expansion of coverage is intended to bring about a measure of compensation uniformly applicable to *persons customarily considered to be working in the business.* Thus, even if an employee does not happen to be over navigable waters at the time he is injured, he will be covered *as long as he is working as a longshoreman or harborworker, whether engaged in repairing a vessel or unloading it.*" 118 Cong.Rec. 36385, Part 27 (1972). (Emphasis added).

. . . .

> The 1972 amended prerequisite of "maritime employment" is a clearly expressed congressional perpetuation of the essential element of admiralty jurisdiction over the employee. In other words, the fixed federal compensation is provided in lieu of the uncertainty of a recovery by an injured ship worker for a maritime tort. The occupational hazards intended to be guarded against are the traditional hazards to the ship's service employee arising in the course of his employment; *i. e.,* the perils of the sea and an unseaworthy vessel recognized under maritime laws. Accordingly we believe that to be entitled to the benefits of LHCA, an employee's employment must have a realistic relationship to the traditional work and duties of a ship's service employment. Otherwise the clear and unambiguous congressional language of "maritime employment" is nullified and rendered to read "any employment."
>
> We hold that for an injured employee to be eligible for federal compensation

under LHCA, his own work and employment, as distinguished from his employer's diversified operations, including maritime, must have a realistically significant relationship to "traditional maritime activity involving navigation and commerce on navigable waters," with the further condition that the injury producing the disability occurred on navigable waters or adjoining areas as defined in § 903. (omitted.)

. . . .

The Law Judge thought that the Claimant at the time of the accident was not so "engaged in maritime employment" and denied the claim. The Law Judge reasoned that in order for the Claimant to recover:

"[A] relationship should exist between the duties of Claimant and some maritime service, navigation or commerce on navigable waters . . . .
"Here claimant was a mill worker. The navigable water [the long pond] was used as an easy means to transport logs from point to point in the manufacturing process and had no close relationship to any maritime activity . . . ."

. . . .

We find it illogical to think of a pondman's work and duties at or on an upland sawmill's log pond as "maritime employment" in the traditional sense.

*Id.* at 960–961 (citations omitted).

Surely, it seems to me, the same is true here; lumbering, like oil production, is a massive industry, conducted partly on land and partly on navigable waters of the United States. But the work of a tool pusher or wireline operator, wherever conducted, is no more ship's service employment or a traditional maritime activity than is breaking a log jam.

The rule of the Fourth Circuit is to like effect. In *Caldwell v. Ogden Sea Transport, Inc.*, 618 F.2d 1037 (4th Cir. 1980), *rev'd on other grounds in Rodriguez v. Compass Shipping Co.*, 451 U.S. 596, 101 S.Ct. 1945, 68 L.Ed.2d 472 (1981), that court, laying down principles to be observed by the district court in determining LHWCA coverage on remand, observed:

*Northeast Marine Terminal Co. v. Caputo,* . . . emphasized that "maritime employment" must be construed in light of the purpose of the 1972 amendments to LHWCA. These extended its coverage landward in recognition that with the advent of container shipping much work formerly done aboard ship is now performed dockside, and this makes the question whether a claimant was engaged in maritime employment, hence covered by LHWCA, one not dependent simply upon whether his employment positioned him on land or over water. 432 U.S. 269–72, 97 S.Ct. at 2360–61. In recognition that the factual issue in a particular case is more complicated than that, we have focused in our decisions on whether a claimant asserting harbor-worker status was "directly involved" in the work of shipbuilding, though he may not have worked aboard ship, *Newport News Shipbuilding & Dry Dock Co. v. Graham,* 573 F.2d 167, 170 (4th Cir. 1978), and on whether a claimant asserting longshoreman status was an "integral part of the unloading process," *Conti v. Norfolk & Western Ry.,* 566 F.2d 890, 895 (4th Cir. 1977). *See Pfeiffer Co. v. Ford,* 444 U.S. at 76, 100 S.Ct. at 334 (1979). This reflects recognition that *Congress did "not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel,* just because they are injured in an area adjoining navigable waters used for such activity." H.R.Rep. No.92–1441, 92nd Cong., 2d Sess. 11, *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 4698, 4708.

*Id.* at 1050 (emphasis added).

If any other circuit has adopted the views expressed in *Pippen* or by today's majority, I am unaware of it and the majority opinion cites no such instance. To be sure, we are free to adopt our own notions of "expanded coverage" and our own construction of "marine employment," but it seems to me especially unfortunate that in the course of construing and applying a federal statute of

national application we now espouse positions that are at clear variance with those of identical congressional reports from both Houses, with those of three major maritime sister circuits and, in all likelihood, with those of the Supreme Court.

*The work of the injured employee as "essential to the function of the vessel."*

Strangely, both majority opinions stress the essential character of the injured employees' work to the mission of the vessel on which they were injured. It may be that the point intended is merely to tie-the employees to what the opinions now declare to be a part of maritime navigation and commerce: offshore mineral production. If so, the matter is material to the discussion that follows in the next sub-heading. But the expressions of the opinions seem also to argue that each was a part of the vessel's crew.

In *Pippen*, for instance, the court observes:

> In the instant case, plaintiff Pippen was a wireline operator. At the time of his injury he was preparing to set packers for perforation. The function of the vessel on which Pippen was working was to drill gas wells; consequently, Pippen's work was essential to the function of the vessel. More importantly, Pippen's job was necessary to the completion of the offshore drilling process.

661 F.2d at 383–84 (footnote omitted).

Today's majority reiterates the circumstance:

> In *Pippen*, as here, the injured worker was performing wirelining work that was essential to the work of the vessel (drilling barge) upon which he was working—i. e., offshore mineral production. The wireline employee was injured while working on a drilling barge on navigable inland waters.

(P. 465). If so, while he may have been a Jones Act seaman, *see Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959), he cannot have been a longshoreman: 33 U.S.C. Section 902(3) excludes from LHWCA coverage "a master or member of a crew of any vessel ...." Thus if the majorities are correct in their suggestions, and Messrs. Pippen and Boudreaux were in fact members of a vessel's crew, this would prevent, not provide, LHWCA coverage.

*Inland marine oil production as "maritime commerce or navigation."*

At the heart of both majority opinions, *Pippen* and today's, lies a simple *ipse dixit*: oil and gas production from the bed of navigable waters of the United States is maritime commerce or navigation and, therefore, work in connection with it is "maritime employment." To support this sweeping declaration neither opinion, except insofar as today's relies on *Pippen*, advances any basis whatever of prior authority.

*Pippen* cites three classes of authorities, none supportive of its conclusions except the now-invalidated *St. Julien*. The first are those that stand for the long-established and undoubted proposition that landside-type work done on repairing a boat [*Mississippi Coast Marine, Inc. v. Bosarge*, 637 F.2d 994 (5th Cir. 1981)], on an actual facility of maritime commerce, a pier [*Trotti & Thompson v. Crawford*, 631 F.2d 1214 (5th Cir. 1980)], or on clearing a navigable channel [*Odom Construction Co. v. United States Dep't of Labor*, 622 F.2d 110 (5th Cir. 1980), *cert. denied*, 450 U.S. 966, 101 S.Ct. 1482, 67 L.Ed.2d 614 (1981)], is maritime in nature. But of course it is, since it all relates to shipping. In the second class cited fall those authorities which deny that work such as Messrs. Pippen and Boudreaux were doing is maritime employment and therefore reject LHWCA coverage. These are *Weyerhauser* (lumber worker), and *Fusco II* (sewage plant construction worker), both discussed above. The third comprises *St. Julien* only, whose "general extension" rationale, *Pippen* admits, 661 F.2d at 383 n.7, was rejected by the Supreme Court in *Pfeiffer*. None of these support, in any degree whatever, *Pippen*'s broad departure. To these today's majority adds only a law review commentary, written before *Pfeiffer* and likewise undermined by it.[14]

---

14. Robertson, *Injuries to Marine Petroleum Workers: A Plea for Radical Simplification*, 55 Tex.L.Rev. 973 (1977). The article declares, for example, "The 1972 amendments make clear that all these workers [floating nonseamen hurt within three miles of shore] are now covered by the Longshoremen's Act." *Id.* at 987 (footnote omitted), *citing St. Julien* and the administrative law judge's opinion in *Anderson*, subsequently reversed by the Benefits Review Board, *see* note 10 *supra*. This is, by hindsight, incorrect and far too broad, *e. g. Thibodeaux v. Atlantic Richfield Co.*, 580 F.2d 841 (5th Cir. 1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2820,

Thus the radical extension of LHWCA coverage decreed by *Pippen* becomes plain for what it is, the simple declaration and enactment into law by the court of a policy choice that it thinks desirable. Henceforth in our circuit, shipping and harbor work are to be joined in the category of maritime commerce and navigation by oil field work performed on the inner seas. The last time such a broadcast extension of coverage took place, it was decreed by the Congress in the Outer Continental Shelf Lands Act.[15] *Pippen* decrees the present extension of its own force. For reasons that I have discussed more fully elsewhere,[16] I think the judicial process ill-suited for making such essentially legislative decisions, proceeding, as it necessarily does, on the basis of deductive reasoning and without adequate consideration of cost factors, of competing values foregone, or of legitimate public views and desires. The present decision seems to me especially unfortunate, since it forces on injured workers a system that they have resisted and Congress has rejected, see note 8 *supra*, places us in a position of conflict with every other maritime circuit that has considered the matter, and insures that there will be one law offshore of Louisiana, Mississippi, and Texas, and another everywhere else. If this were to be done, I think it was for the Congress to do. Had it done so, the national law that we address would be uniform. Today and in *Pippen*, we decree otherwise. I respectfully dissent.

On Rehearing and Rehearing En Banc

Before CHARLES CLARK, BROWN, GEE, RUBIN, GARZA, REAVLEY, POLITZ, RANDALL, TATE, SAM D. JOHNSON, WILLIAMS and GARWOOD, Circuit Judges.

BY THE COURT:

A member of this Administrative Unit of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in this Administrative Unit in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by this Administrative Unit of the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

---

61 L.Ed.2d 274 (1979) (oil field worker drowned on navigable inland marine waters on way to work at land site not covered), and *Pfeiffer*. The "Radical Simplification" pled for has not occurred.

I note in passing that this article appears also to supply such factual basis as exists for the majority's broad reference to "40,000 jobs, . . . and untold millions of dollars in revenues, etc." (P. 468).

15. 43 U.S.C. § 1333(b) (Supp. III 1979).

16. *Starving the Tiger: Some Problems about the Federal Bench*, 34 Southwestern L.J. 1171, 1179 (1981).

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.